## Nesbit v. Alton

*Joseph A. Ryan* and *W. Mark Mullineaux,* for plaintiff.

*Francis Recchuiti,* for defendant.

SUGERMAN, *P.J.,* December 4, 1986 — Plaintiff, Thorpe Nesbit Jr., filed an amended complaint containing four counts. Three such counts sound in replevin and seek the return of various items of personal property presently in the possession of defendant, Virginia Alton. The fourth such count seeks a declaratory judgment determining that plaintiff is the sole and exclusive owner of a 39-foot Pearson

yawl now registered in the name of plaintiff and defendant as joint tenants with the right of survivorship.

Plaintiff's theory underlying each of the counts is that all the property, including defendant's interest in the yawl, was given to defendant by plaintiff as conditional gifts, in contemplation of marriage. Plaintiff asserts that as defendant terminated the parties' engagement prior to the marriage, he is entitled to a return of all such property.

Defendant responded to plaintiff's amended complaint with an answer containing new matter and a counterclaim. In her answer, defendant denies plaintiff's assertion that the gifts were made by plaintiff conditionally, in contemplation of marriage as, defendant asserts, the parties were never engaged and defendant never promised or agreed to marry plaintiff. In defendant's counterclaim, she seeks to recoup various sums of money she assertedly expended or advanced on behalf of plaintiff, including the cost of repairs and docking to and for the yawl. Plaintiff's reply to the defendant's counterclaim denies any obligation to reimburse the defendant for such expenditures.

With the issues thus drawn, we tried the matter without a jury on June 5, 1985, September 27, 1985, February 24, 1986, and February 25, 1986. Counsel for the parties have filed post-trial memoranda and the matter is ripe for disposition. From the transcript of the testimony and the evidence of record we make the following

## FINDINGS OF FACT

(1) Plaintiff, Thorpe Nesbit Jr., is an adult individual residing at 3 Montgomery Lane, Radnor, Delaware County, Pa.

(2) Defendant, Virginia Alton, is an adult individual residing at 31 Wingston Lane, Devon, Chester County, Pa.

(3) Plaintiff and defendant were introduced to each other on March 22, 1984, by plaintiff's daughter and defendant's son who worked together.

(4) Thereafter, the parties were together socially once or twice each week until early July 1984.

(5) In early July 1984, defendant accompanied plaintiff to Nova Scotia where plaintiff was renovating a dwelling; and while in Nova Scotia, the parties shared a room in each of three motels.

(6) During their stay in Nova Scotia, plaintiff proposed marriage to defendant but defendant declined, telling plaintiff that she was at the time involved in an ongoing relationship with a man named Lewis Beers.

(7) Shortly after the parties returned from Nova Scotia, defendant met with Mr. Beers on a boat owned by him and docked in Maryland; Beers and defendant became involved in an altercation and Beers apparently struck defendant. Thereafter, defendant received a threatening telephone call from Beers and then asked plaintiff to visit her.

(8) As the result of the altercation, plaintiff instructed his attorney, John Rogers Carroll, to advise Mr. Beers to "stay away" from defendant. Defendant had not authorized such instruction and upon learning of it, asked plaintiff to cause it to be retracted

(9) On July 19, 1984, plaintiff again proposed marriage to defendant and defendant accepted such proposal.

(10) Plaintiff and defendant agreed to marry on October 6, 1984, the anniversary of defendant's parents' marriage. However, the date was postponed as defendant still "had feelings" for Mr. Beers, al-

though plaintiff and defendant still planned to marry before the end of the year 1984. Finally, the parties decided to postpone their marriage until the close of the 1984 tax year.

(11) During the period July 1984 through December 1984, plaintiff paid various bills incurred by defendant and also gave defendant cash in amounts varying between $1,000 and $1,500 monthly, all aggregating in the sum of $18,570.

(12) In the late summer or early fall of 1984, plaintiff listed his dwelling at 1717 Martin's Lane, Gladwynne, Pa., for sale with defendant, who was then a real estate salesperson, as plaintiff intended to reside with defendant at her dwelling in Devon.

(13) In preparation for the sale of plaintiff's dwelling and future cohabitation with defendant, plaintiff caused various items of personal property in his dwelling to be lodged in the defendant's dwelling in Devon.

(14) Plaintiff in contemplation of the pending marriage purchased furniture and caused it to be delivered to defendant's dwelling for the future joint use of the parties.

(15) Throughout the fall of 1984, the parties attended various social functions together, including a party arranged by defendant for her parents on October 6, 1984, a wedding involving plaintiff's stepbrother later in October, the Amethyst Ball on October 27, 1984, and a Thanksgiving Day dinner to which defendant invited plaintiff's family.

(16) At plaintiff's stepbrother's wedding, supra, plaintiff introduced defendant as his fiancée, apparently without objection by defendant.

(17) On November 8, 1984, reporting on the Amethyst Ball, a newspaper, the Surburban and Wayne Times, published an article describing defendant as the "charming fiancée" of plaintiff, soon

to be married and defendant, although aware of the article, did not object to it and did not ask the newspaper to retract the article.

(18) In August 1984, defendant took plaintiff to inspect a 39-foot Pearson yawl named "Makai", and the parties were guests of the owners of Makai on two cruises; and in the course of a third cruise, plaintiff purchased the yawl for the sum of $68,000.

(19) The Makai at plaintiff's direction, was titled in the names of plaintiff and defendant as joint tenants with the right of survivorship and plaintiff would not have so titled the yawl if the parties had not been engaged to be married as plaintiff desired that defendant be "protected" until he included her in his will.

(20) During the months of September and October 1984, the parties shopped for a wedding ring, and ultimately, on December 4, 1984, plaintiff puchased a custom-made diamond ring for defendant from Wayne Jewelers and Silversmiths for the sum of $8,500.

(21) The ring was shipped by the jeweler to defendant's parents in New Jersey in order to avoid Pennsylvania sales tax and when defendant's parents brought the ring to defendant's dwelling in Devon on Christmas Eve 1984, defendant refused to wear it as the parties were not yet married.

(22) On December 26, 1984, at plaintiff's request, plaintiff's attorney, Frank G. Cooper, sent defendant's attorney, Francis Recchuiti, a letter; and the letter described plaintiff's assets and proposed an antenuptial agreement between the parties.

(23) Plaintiff and defendant were booked to sail on a cruise ship from Fort Lauderdale, Fla., on January 5, 1985; the reservations were made by plaintiff in the names of "Mr. and Mrs. Thorpe Nesbitt" as the parties had intended to be married by that

time and defendant did not object to the reservations in such form and wore the wedding ring for the first time during the trip south to Fort Lauderdale.

(24) Upon arriving at Fort Lauderdale, on January 4, 1985, the parties, while in their hotel room, engaged in a violent quarrel and the engagement was thereupon terminated; plaintiff returned to Pennsylvania and defendant and her son boarded the cruise ship the following day.

(25) The Makai had been in dry storage where no maintenance was required, but sometime prior to June 5, 1985, defendant caused the yawl to be launched and expanded her time and money upon it for the express purpose of chartering it to others; plaintiff at no time authorized or agreed to pay any such expenses and received no charter fees; and both parties, independently of each other, caused the yawl to be insured for the year September 1985 to September 1986.

## DISCUSSION

### Plaintiff's Claims

Although there appears to be a dearth of appellate authority in Pennsylvania discussing the subject of conditional gifts in contemplation of marriage, those few decisions that are available to us have, in the view of at least one commentator, resulted in the development of a most comprehensive body of case law. 46 A.L.R. 3d 578, 593 (1972). A brief summary of a few of those appellate decisions may therefore be most appropriate.

The earliest reported decision that our research reveals is *Ruehling v. Hornung,* 98 Pa. Super. 535 (1929), involving an action in replevin seeking the return of an engagement ring, a watch and a medal-

lion given by plaintiff to defendant. Plaintiff testified that the parties were engaged to be married prior to the presentation of the gifts. Defendant denied that the parties had ever been engaged but additional evidence was held to be sufficient to permit the jury to find that the parties had indeed been engaged and that the gifts were delivered in contemplation of marriage.

The court first noted the general statement of the law as set forth in 28 Corpus Juris §651:

"A gift to a person to whom the donor is engaged to be married, made in contemplation of marriage, although absolute in form, is conditional; and upon breach of the marriage engagement by the donee, the property may be recovered by the donor. But if the gift is made simply for the purpose of introducing the donor to the donee's acquaintance and to gain her favor, the property is not recoverable, although marriage does not ensue. So where a Christmas present is made by a man to his fiancée it becomes her property and the subsequent breaking of the engagement does not entitle him to recover it back." 98 Pa. Super. at 538.

The court then observed that in the case before it, plaintiff-donor had not proved a breach of the promise to marry by defendant-donee. The court declined to hold that *all* gifts given by plaintiff to defendant were subject to an *implied* condition that such property would be returned when the engagement was dissolved. The court did hold, however, that such implied condition *did* in some circumstances attach to the engagement ring, saying as it did:

"We think that it [the ring] is always given subject to the implied condition that if the marriage does not take place either because of the death, or a disability recognized by the law on the part of, either party, or by breach of the contract by the donee, or

its dissolution by mutual consent, the gift shall be returned." Id. at 540.

As the court found that it did not appear whether the engagement was broken by plaintiff or dissolved by mutual consent, the court granted plaintiff's motion to take off a nonsuit entered by the trial court at the conclusion of plaintiff's case and remanded for a new trial. Id. at 540.

Implicit in the court's opinion is the suggestion that a conditional gift in contemplation of marriage will be returned to the donor in the same circumstances if such condition is *expressed* at the time the gift is given.

In *Stanger v. Epler,* 382 Pa. 411, 115 A.2d 197 (1955), a decision bearing directly upon the matter at hand, the Supreme Court of Pennsylvania determined that a gift of a one-half undivided interest in a joint savings account could not be held to be a conditional gift in contemplation of marriage in the absence of evidence of such condition which is "clear, precise and indubitable." Id. at 416, 417, 115 A.2d at 198, 199.

The holding in *Stanger* rests in part upon a finding that evidence as to whether the parties were actually engaged to marry was contradictory. Athough the *Stanger* court cites *Ruehling v. Hornung,* supra, with approval (*Stanger,* at 415, 416, 115 A.2d at 199), it does not address the question of whether the condition must be expressed or may be implied.

Two years subsequent to the decision in *Stanger,* however, the Supreme Court, in *Pavlicic v. Voglstrerger,* 390 Pa. 502, 136 A.2d 127 (1957) appears to have ignored the earlier distinction between an implied and an expressed condition. The court, citing both *Stanger* and *Ruehling,* did not dis-

approve the language of 26 Corpus Juris §651, cited in *Ruehling* as the court said:

"The act of 1935[1] in no way alters or modifies the law on antenuptial conditional gifts as expounded in 26 C.J. 651, and quoted by us with approval in the case of *Stanger v. Epler,* 382 Pa. 411, 415, namely: 'A gift to a person to whom the donor is engaged to be married, made in contemplation of marriage, although absolute in form, is conditional; and upon breach of the marriage engagement by the donee the property may be recovered by the donor.'

"In the case of *Ruehling v. Hornung,* 98 Pa. Super. 535, 538, the Superior Court quoted with approval from Thornton on Gifts and Advancements as follows: 'If the intended husband makes a present after the treaty of marriage has been negotiated, to his intended wife, and the inducement for the gift is the act of her promise to marry him, if she breaks off the engagement he may recover from her the value of such present.' " Id. at 510-11, 136 A.2d at 131.

In the most recent decision on the subject, however, the question of expressed and implied conditions is again explored. In *Ferraro v. Singe,* 343 Pa. Super. 576, 495 A.2d 946 (1985), the court, although according deference to the holdings in *Ruehling v. Hornung,* supra, and *Stanger v. Epler,* supra, said nonetheless:

"The conceptual basis of a cause of action based on the right to return of gifts made on the condition of subsequent marriage was explained in *Ruehling v. Hornung,* 98 Pa. Super. 535 (1930), subsequently endorsed in *Stanger v. Epler,* 382 Pa. 411, 115

1. Act of June 22, 1935, P.L. 450, 48 P.S. §171, popularly known as the "Heart Balm Act," abolished the cause of action for breach of a contract to marry.

A.2d 197 (1955). *The law of conditional gifts creates a cause of action distinct from breach-of-promise-to-marry suits. Its recognition in the common law is based upon an implied-condition theory. A* gift given in contemplation of marriage, such as an engagement ring, was not final but conditioned upon the occurrence of the wedding. As such, it was subject to being returned to the donor upon the failure of the condition subsequent." Id. at 580, 495 A.2d at 948 (emphasis added).

Our research has also revealed the decision of the Supreme Court in *Semenza v. Alfano*, 443 Pa. 201, 279 A.2d 29 (1971). The parties in *Semenza* had been divorced but defendant former wife agreed to remarry plaintiff former husband if he were to "put a roof over her head and that of her son." Id. at 203, 279 A.2d at 30. Relying upon defendant's promise, plaintiff purchased a dwelling with his own funds and money borrowed solely by him and caused the dwelling to be titled in the name of both parties. When defendant discovered that plaintiff had failed to pay the persons with whom defendant had arranged to decorate and furnish the dwelling, she "called off " the remarriage. Id.

Plaintiff sued in equity seeking a reconveyance of defendant's interest in the dwelling. The chancellor found that the transfer of an interest in the dwelling to defendant was a conditional gift and ordered a reconveyance to plaintiff.

On appeal, defendant argued that *Pavlicic* and *Stanger* were inappropriate as those cases involved gifts of personal property rather than real property. Although at bar we also are concerned with personal property, the Supreme Court's response to defendant's argument is instructive. Disagreeing with defendant's attempt to distinguish the two classes of property, the court said:

". . . The promise to return an antenuptial gift made in contemplation of marriage if the marriage does not take place is a fictitious promise implied in law. There need not be any promissory assent, either written or unwritten." Id. at 204, 279 A.2d at 31.

The court then applied a constructive trust analysis to dispose of the case as it said:

"As we wrote in *Truver v. Kennedy,* 425 Pa. 294, at 305, 229 A.2d 468 (1967), quoting from Justice Carbozo, in *Beatty v. Guggenheim Exploration Co.,* 225 N. Y. 380, 122 N.E. 378 (1919), 'A constructive trust is the formula through which the conscience of equity finds expression. When property has been acquired in such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest equity converts him into a trustee.' The receipt of an antenuptial gift in contemplation of a marriage which never takes place is just such a circumstance." Id. at 205, 279 A.2d at 31.

In summary, then, we may conclude that in appropriate circumstances the law will *imply* a promise on the part of the donee to return a gift made in contemplation of marriage. We are convinced that all the items of personal property given by plaintiff to defendant, including defendant's interest in the yawl, were conditional gifts, made during the parties' engagement in contemplation of a marriage that never occurred.

Such finding, however does not end our inquiry. It will be recalled that *Ruehling v. Hornung,* supra, holds quite clearly that a gift in contemplation of marriage "is always given subject to the implied condition that if the marriage does not take place either because of the death, or a disability recognized by the law on the part of, either party, *or by breach of the contract by the donee, or its dissolution by*

*mutual consent,* the gift shall be returned." Id. at 540 (emphasis added).

Thus it would appear that in order to afford plaintiff the relief he seeks,' we must also find that defendant caused the engagement to be terminated or that the engagement was terminated by mutual consent.

The circumstances leading to the termination of the engagement which occurred during the parties' drive to Fort Lauderdale are described by plaintiff:

Q: [By Mr. Ryan, plaintiff's counsel] Did anything else happen?

A: Yeah. We were running late. Virginia was driving and we wanted to get there. I said, Virginia, I know you're tired and I'll take over driving. But if you want to get there, maybe you better keep on driving. So she kept on driving and we got there.

· We then had dinner, a very pleasant dinner, then another big argument, because we couldn't find where we were supposed to stay. There was a lot of anger there and I felt I was being the victim of a lot of unnecessary anger.

I said, Virginia, go easy on me, at which point she . gave me another five-minute blast, at which point I put the whole thing together and said, maybe I don't want to be married to Virginia.

COURT: When was this?

WITNESS: January 4, 1985.

. . .

· Q: From Georgia to Fort Lauderdale.' How did Virginia treat you on that drive?

A: Not well, in my opinion. And I — this blast of anger, something was getting to Virginia. She was a lot more irritable than she used to be. She stopped being fun to be with. I started to think about Mr. Beers and my feeling that I was last in Virginia's priorities behind the boat, behind her kids, and fi-

nally I thought she never really loved me. I thought a lot about that driving down. I wasn't very happy.

Q: Now, during July and August, did she tell you that she loved you?

A: Maybe once.

Q: Did she put it in writing?

A: Yeah. I used to send her little cards saying I love you.

Q: And she sent one back to you?

A: I believe so.

Q: And in January during the drive down, you concluded that she did not?

A: Yes. I had some evidence of that before that, but it all sort of came together on that drive.

Q: What did you do at that time with regard to the engagement?

A: Well, we got into a big fight in the hotel room, and I in fact broke the engagement.

Defendant's version was described by her thusly:

A: He drove part of the way to my daughter's because I had a migraine. From my daughter's to Florida I drove the entire way. He was falling apart.

Q: What happened when you got to Florida?

A: I had driven for 11½ hours. We could not find the motel we were staying in the night before the ship sailed. He sent me in all these places to look, so I went in and couldn't find the right one.

Q: What were you looking for?

A: We were looking for the motel by the marina. I forget the name of it.

Q: Could it be the Boheamar? [sic: Bahia Mar?]

A: No, it was not. It was similar to it though.

Q: All right.

A: And Thorpe sat in the middle of an intersection, proceeded to wet his pants, was babbling incoherently. I had to get in the car and drive on a wet seat. Finally I found the place, got us checked in.

We got to our room, and I was so outraged I had to go out for a walk. I could not stand being in the same room with him. I just walked down and walked around the dock.

Q: What happened upon your return?

A: I came back to my room. He was into all my makeup, into my lingerie. He was sitting there in his underwear writing a letter to his attorney because he didn't think I was a nice person anymore and he didn't want to go on the cruise.

Q: Is that what he told you?

A: Um-hum.

Q: What did you tell him?

A: I said, fine, let's go home tomorrow. I can't stand being with you one more minute.

Athough plaintiff did indeed testify that he "in fact broke the engagement," we conclude, based on the testimony of the parties quoted supra, that the engagement was terminated by mutual consent.

Inasmuch as we have found that (1) the parties were engaged to be married, (2) all items of personal property given by plaintiff to defendant, including the interest in the yawl, were conditional gifts in contemplation of marriage, and (3) the engagement was terminated by mutual consent, plaintiff is entitled to the relief he has requested.[2]

## Defendant's Counterclaim

As we earlier observed, defendant filed a counterclaim against plaintiff to which defendant filed a reply flatly denying the allegations of the counter-

2. It may, at first glance, appear that we have reached an anomalous result in concluding that defendant consented to terminate an engagement to which she never admitted. We respond quite simply with the observation that we do not credit defendant's testimony upon the subject.

claim. Defendant's entire claim is set forth in the following two paragraphs of her amended answer:

"(63) Plaintiff is bound and owing to defendant in an amount in excess of $10,000 as a result of using her credit cards to purchase personal gifts, all of which required defendant to deplete her savings in order to protect her credit reputation, which further resulted in a loss of interest on those funds which could have and should have been earned by her.

"(64) Defendant has conditioned the boat, put in her personal labor in restoring and making repairs and paying for said repairs, including the slip, said expenses at the present time are in excess of $3,000."

We first consider defendant's claim "in an amount in excess of $10,000" assertedly resulting from plaintiff's use of defendant's credit cards for the purchase of personal gifts.

At the hearing held on February 24, 1986, defendant introduced a group of receipts purporting to represent charges to a number of her accounts with credit card companies and department and specialty stores. Plaintiff emphatically denied incurring any such charges. Defendant's testimony concerning all such charges was vague and at times contradictory. Indeed, defendant admitted that some of the bills representing such charges were paid directly by plaintiff.

In addition, it is undisputed that during much of the period when the charges accrued, plaintiff was giving defendant as much as $1,500 per month.

In sum, the testimony on the subject by defendant was unconvincing, and as noted, vague and contradictory, and in our view, unworthy of belief and offered only as a "makeweight." Such testimony cannot support an award upon the first prong

of defendant's counterclaim. Defendant has failed to carry her burden on the issue.

The second prong of defendant's counterclaim relates to sums expended by defendant to maintain the yawl. Defendant contends that she expended the sum of $10,000.98 upon the yawl for, inter alia, dockage, repairs, supplies and equipment for the purpose of preparing the boat for chartering for hire. At the hearing held on February 24, 1986, defendant introduced a packet of receipts and canceled checks representing such expenditures and a summary of these expenditures and she testified concerning such exhibits. It is undisputed that these sums were expended by defendant without the consent of plaintiff.

We have determined that defendant utilmately did not have an interest in the yawl as the interest given her by plaintiff was conditioned, in contemplation of marriage. The record reveals that defendant was served with a copy of plaintiff's first complaint in replevin on April 2, 1985. That complaint, seeking a return of the yawl to plaintiff, contained, inter alia, the following allegations:

(27) On or about September 2, 1984, plaintiff purchased, with his funds and not with any of defendant's funds, one 39-foot Pearson yawl known as Makai and various accessories for the yawl.

(28) The boat, being purchased solely with plaintiff's funds, is property of and owned by plaintiff.

(29) The boat was registered with the United States Coast Guard in the names of both plaintiff and defendant as joint tenants with right of survivorship, for convenience of the parties who at that time thought they were soon to be married, at the suggestion of the broker who arranged the sale of the boat to plaintiff.

(30) Plaintiff intended that no ownership interest in the boat would pass to defendant until the time that plaintiff and defendant were married. Any ownership interest by defendant in the boat was subject to the condition of marriage of the parties.

(31) Since the parties were not married and their engagement has been terminated, an ownership interest in the boat has not passed to defendant and plaintiff continues to remain sole owner of the boat."

It is readily apparent from an examination of the receipts and canceled checks in evidence that nearly all the sums expended upon the yawl were expended *subsequent* to the date defendant was served with plaintiff's complaint and became formally aware that her interest in the yawl was in dispute and the subject of litigation. In such circumstances, we find the rule set forth in *Cobbett v. Gallagher*, 339 Pa. 228, 13 A.2d 403 (1940) to be applicable.

*Cobbett* considers the right of defendant-lessees in possession of real property to be reimbursed by their co-tenant for improvements made upon the property from the co-tenant's share of the income produced by the property. as in the case at bar, defendant-lessees; right to occupy the property under their lease was in dispute and the subject of litigation and the money was expended by defendants *after* they became aware of the dispute concerning the validity of their lease.

Addressing the questions thus presented, the Supreme Court said pertinently:

"Upon the facts, defendants cannot invoke the principle that one who occupies land under a bona fide, though mistaken, belief that his title is valid, and who makes valuable improvements thereon, is entitled to be repaid out of the income produced

from the land during his occupancy to the extent that the property has been benefited. . . .

"It is true the chancellor found that defendant-assignees 'honestly, although mistakenly, believed that by these several assignments they became and were the owners of undivided interests in an entire lease.' But at the time they acquired their interests they had knowledge of the prior lease of plaintiffs *and in the face of this dispute of title, and after the institution of the present suit, they made the expenditures for which they now claim reimbursement.* Had plaintiffs remained silent and taken no action to assert their rights while defendants were drilling their wells, the claim for reimbursement might have some justification. But it seems to us that under the circumstances here present plaintiffs should not be deprived of the value of the oil wrongfully taken in order to make repayment to defendants of moneys expended at their peril."[3] Id. at 235-36, 13 A.2d at 405 (emphasis added).

We are also aware that joint tenants are jointly liable for repairs necessary to *preserve* the jointly-owned property but that the cost of *improvements* made by one joint tenant upon the property without the consent of the other may not be imposed upon the nonconsenting joint tenant. *Fassitt v. Seip,* 249 Pa. 576, 95 Atl. 273 (1915); *Crest v. Jack,* 13 Watts 238 (1834); *Sharp v. Kaiser,* 95 Pa. Super. 174 (1928); *Oughter v. Continental Associates, Inc.* 20 D.&C.2d 551 (1956).

---

3. We recognize that *Cobbett* deals with real property and that the yawl at bar is personal property. Co-tenancies may be created in either class of property, however, 20 Am Jur 2d, Co-Tenancy and Joint Ownership, §6 at 97, and there appears to be no basis upon which to apply different rules to each class.

On the record before us, we are unable to find that defendant's expenditures were necessary to preserve the yawl. Indeed, the parties agreed that the cost of permitting the yawl to remain in dry storage during the period in question was the sum of $700. As is further apparent, the yawl was removed from dry storage by defendant against plaintiff's wishes and refitted for chartering by defendant. The testimony is not at all clear as to whether any of the work performed by defendant or at her request was performed for the purpose of preserving the yawl although plaintiff's objection to defendant's conduct is clear. The burden is upon defendant to demonstrate the necessity of the work to the preservation of the yawl in order to recover from her purported joint tenant. *Sharp v. Kaiser,* supra; *Outhter v. Continental Associates Inc.,* supra. This the defendant has failed to do.

In sum, we find that defendant expended the sum of $1,293.55 upon the yawl prior to her receiving actual notice that her interest in the yawl was diputed by plaintiff, and that she is entitled to recover that sum from plaintiff.[4]

## CONCLUSIONS OF LAW

(1) This court has jurisdiction of the parties to and the subjects of the within action.

(2) All items of personal property set forth in paragraphs 7 and 8 of plaintiff's amended complaint[5] and the wedding ring described in para-

---

4. We note that plaintiff has not sought to recover a share of such chartering fees as defendant may have received. Presumably, such fees will, at least in part, reimburse defendant for the sums she expended in preparing the yawl for charter service.

5. Excepting the Chinon Camera set forth in paragraph 7(j).

graph 17 thereof were conditional gifts, given by plaintiff to defendant in contemplation of marriage, and as the condition failed by the mutual consent of the parties, defendant has no right, title or interest therein and no right to continued possession thereof.

(3) Defendant has no right, title or interest in the Pearson yawl "Makai" or in the sails, accessories, gear and equipment appertaining thereto.

(4) Defendant is entitled to reimbursement from plaintiff in the sum of $1,293.55, expended by defendant upon the said yawl; and except for such sum, defendant's counterclaim should be dismissed.

## ORDER

And now, this December 4, 1986,

(1) Defendant shall forthwith return to plaintiff the items of personal property set forth in paragraphs 7 and 8 of plaintiff's amended complaint or the equivalent sums of money as set forth therein.

(2) Defendant shall forthwith return to plaintiff the wedding ring described in paragraph 17 of plaintiff's amended complaint or the sum of $8,500 being the appraised value thereof.

(3) The court finds as a matter of law that defendant has no right, title or interest in the Pearson yawl "Makai" or in the sails, accessories and equipment appertaining thereto.

(4) Plaintiff shall pay to defendant the sum of $1,293.55 upon defendant's counterclaim.