No. 99-611

IN THE SUPREME COURT OF THE STATE OF MONTANA

2002 MT 118

MICHAEL A. ALBINGER,

       Plaintiff, Respondent and Cross-Appellant,

  v.

MICHELLE L. HARRIS,

       Defendant and Appellant.

APPEAL FROM:    District Court of the Eighth Judicial District,
                   In and for the County of Cascade,
                   The Honorable Kenneth R. Neill, Judge presiding.

COUNSEL OF RECORD:

       For Appellant:

           Nathan J. Hoines, Great Falls, Montana

       For Respondent and Cross-Appellant:

           Ward E. Taleff, Alexander, Taleff, Baucus & Paul, Great Falls, Montana

Submitted on Briefs:  December 29, 2000

Decided:  June 6, 2002

Filed:

_____
                       Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶1     Who owns a ring given in anticipation of marriage after the engagement is broken? Michelle L. Harris (Harris) appeals the disposition of an engagement ring by the Eighth Judicial District Court, Cascade County, Montana, and Michael A. Albinger (Albinger) cross-appeals the denial of reimbursement for certain telephone charges incurred by Harris and the award of damages for a prior, unlitigated assault and battery claim.  We reverse the disposition of the engagement ring, affirm the denial of  reimbursement for telephone charges and affirm the award for pain, suffering and emotional distress.

¶2     We frame the issues on appeal as follows:

¶3     1. Did the District Court err in determining an engagement ring is a conditional gift that may be revoked upon termination of the engagement?

¶4     2. Did the District Court err in denying Albinger reimbursement for telephone charges incurred by Harris during cohabitation?

¶5     3.  Did the District Court err in awarding Harris compensation for general damages resulting from an assault and battery by Albinger?

### FACTUAL AND PROCEDURAL BACKGROUND

¶6     Harris and Albinger met in June 1995, and began a troubled relationship that endured for the next three years, spiked by alcohol abuse, emotional turmoil and  violence.  Albinger presented Harris with a diamond ring and diamond earrings on December 14, 1995.  The ring was purchased for $29,000.  Days after accepting the ring, Harris returned it to Albinger and traveled to Kentucky for the holidays.  Albinger immediately sent the ring back to Harris by mail.   The couple set a tentative wedding date of June 27, 1997, but plans to marry were put on hold as Harris and Albinger separated and reconciled several times.  The ring was returned to or reclaimed by Albinger upon

2

each separation, and was re-presented to Harris after each reconciliation.

¶7 Albinger and Harris lived together in Albinger's home from August 1995 until April 1998. During this time, Albinger conferred upon Harris a new Ford Mustang convertible, a horse and a dog, in addition to the earrings and ring. Harris gave Albinger a Winchester hunting rifle, a necklace and a number of other small gifts. Albinger received a substantial jury award for injuries sustained in a 1991 railroad accident. He paid all household expenses and neither party was gainfully employed during their cohabitation.

¶8 On the night of February 23, 1997, during one of the couple's many separations, Albinger broke into the house where Harris was staying. He stood over Harris' bed, threatened her with a knife and shouted, "I'm going to chop your finger off, you better get that ring off." After severely beating Harris with a railroad lantern, Albinger forcibly removed the ring and departed. Harris sued for personal injuries and the county attorney charged Albinger by information with aggravated burglary, felony assault, and partner and family member assault. The next month, after another reconciliation, Harris requested the county attorney drop all criminal charges in exchange for Albinger's promise to seek anger management counseling and to pay restitution in the form of Harris' medical expenses and repair costs for damage to her friend's back door. Harris also directed her attorney to request the court dismiss the civil complaint without prejudice.

¶9 The parties separated again in late April 1998. Albinger told Harris to "take the car, the horse, the dog, and the ring and get the hell out." During their last month together, Harris ran up approximately $1,000 in telephone charges on Albinger's credit card. Harris had been free to use Albinger's telephone throughout the relationship, and Albinger paid the bills. Harris moved from Great Falls, Montana to Kentucky, where she now resides. The parties dispute who was responsible

for the end of the relationship. No reconciliation followed, marriage plans evaporated and Harris refused to return the ring.

¶10 Albinger filed a complaint on August 31, 1998, seeking recovery of the ring or its monetary value and payment for $1,000 in telephone charges. Harris counterclaimed for damages resulting from the assault of February 23, 1997.

¶11 At the conclusion of the trial, both parties submitted briefs discussing how the statute barring actions for breach of promise to marry, § 27-1-602, MCA, impacts an action to recover an engagement ring. The District Court found the ring to be a gift in contemplation of marriage, and reasoned that § 27-1-602, MCA, did not bar the action because the case could be decided on common-law principles, as opposed to contract theories. The court implied the existence of a condition attached to the gift of the engagement ring. Disregarding allegations of fault for "breaking" the engagement, the court concluded that the giver is entitled to the return of the ring upon failure of the condition of marriage.

¶12 On September 2, 1999, the District Court awarded the engagement ring or its reasonable value and court costs to Albinger, and denied recovery for the telephone charges. Harris was awarded $2500 for pain, suffering and emotional distress. From this judgment, Harris appeals the disposition of the ring and Albinger cross-appeals the denial of telephone charges and the award of damages to Harris.

**STANDARD OF REVIEW**

¶13 In reviewing a district court's findings of fact, we determine whether the findings are clearly erroneous. *In re Marriage of Griffin* (1996), 275 Mont. 37, 44, 909 P.2d 707, 711. The three-part test we use to determine whether findings are clearly erroneous in a non-jury case provides that: (1)

4

the Court will determine whether the findings are supported by substantial evidence; (2) if the findings are supported by substantial evidence, the Court will determine if the district court has misapprehended the evidence; and (3) if the findings are supported by substantial evidence and that evidence has not been misapprehended, this Court may still find that a finding is "clearly erroneous when, although there is evidence to support it, a review of the record leaves the Court with the definite and firm conviction that a mistake has been committed." *Griffin*, 275 Mont. at 44, 909 P.2d at 711-12 (*citing DeSaye v. Interstate Production Credit Assn.* (1991), 250 Mont. 320, 323, 820 P.2d 1285, 1287). The standard of review of a district court's conclusions of law is whether the court's interpretation of the law is correct. *In re Estate of Kuralt*, 2000 MT 359, ¶ 14, 303 Mont. 335, ¶ 14, 15 P.3d 931, ¶ 14.

**Issue 1.**

¶14    *Did the District Court err in determining an engagement ring is a conditional gift that may be revoked upon termination of the engagement?*

¶15    Albinger and Harris gave one another numerous gifts of substantial value during their engagement. The ring is the only item now in controversy. When this Court was last presented with the question whether an antenuptial transfer of jewelry from fiancé to fiancée, which included an engagement ring, constituted consideration for the mutual promise of marriage or was an unconditional gift, we remanded the case for a new trial and factual findings on the matter. *Davidson v. Stagg* (1933), 94 Mont. 272, 278, 22 P.2d 152, 154. In the instant case, the parties agree that the ring was a gift. The crux of the dispute today is whether a condition of marriage attached to the gift as a matter of law at the time Albinger presented the ring to Harris.

¶16    Harris contends the ring lost any association with a promise to marry after the first incidence

of domestic violence. The couple canceled their June 1997 nuptials and never revived explicit wedding plans. In response to a question about the ring's symbolic relationship to a promise to marry after the couple's numerous break-ups, reconciliations, and incidents of domestic violence, Harris testified, "[A]fter a while you don't think about that stuff. You just resume life." Albinger argues that the ring was presented as a gift only upon the unspoken condition that the wedding take place.

¶17    The District Court found the ring at issue in this action to be an engagement ring given in contemplation of marriage, and not a gift in commemoration of another occasion or as consideration for any other anticipated acts on the part of Harris. The court noted Albinger proposed marriage to Harris on December 14, 1995, and presented her with the ring at that time. Harris accepted both the marriage proposal and the ring. Although the ring was reclaimed by or returned to Albinger numerous times during the ensuing years, both Albinger and Harris referred to the ring as an "engagement ring" with some consistency. We conclude that the court's characterization of the disputed gift as an engagement ring is supported by substantial evidence and is not clearly erroneous.

¶18    Legal ownership of the gift of an engagement ring when marriage plans are called off is an issue of first impression in Montana. In 1963, the Legislature barred access to the courts for actions arising from breach of the promise to marry. Sec. 2, Chap. 200, L. 1963. The District Court determined that this action brought to recover an antenuptial gift is maintainable, notwithstanding § 27-1-602, MCA, which states:

> All causes of action for breach of contract to marry are hereby abolished. However, where a plaintiff has suffered actual damage due to fraud or deceit or a defendant has been unjustly enriched, the plaintiff may maintain an action for fraud or deceit or unjust enrichment and recover therein only the actual damage proved or for the

6

benefit wrongfully obtained or restitution of property wrongfully withheld where such action otherwise is maintainable under existing law.

¶19 According to the District Court's analysis, the statute goes no further than to bar actions for general damages sustained by the loss of marriage such as humiliation, lost opportunities, emotional suffering and other non-specific consequences of the breach. We agree with the court's conclusion that the rights and duties of the parties regarding property exchanged "in contemplation of marriage" are still determined by existing law and common-law principles.

¶20 The District Court presents a cogent summary of common-law principles applied to antenuptial gift disputes in the wake of the abolition of breach of promise actions. Section 27-1-602, MCA, specifically preserves actions based upon fraud, deceit or unjust enrichment. Albinger levels no accusations of fraud or deceit, but nevertheless claims Harris is unjustly enriched by the value of the engagement ring.

¶21 The doctrine of unjust enrichment is an equitable means of preventing one party from benefitting by his or her wrongful acts, and, as such requires a showing of misconduct or fault to recover. *Sebena v. State* (1994), 267 Mont. 359, 367, 883 P.2d 1263, 1268 (*citing Randolph v. Peterson, Inc.* (1989), 239 Mont. 1, 8, 778 P.2d 879, 883). Albinger argues that the engagement ring was a conditional gift that he could revoke when the implied condition of marriage failed. Hence, Harris' refusal to return the ring upon demand constituted unjust enrichment. Harris contends she deserves the ring because Albinger repeatedly beat her, forcibly took the ring back, and was the one who finally ended the engagement by ordering Harris to move out of the residence where they had been living together.

¶22 The District Court declined to undertake a determination of which party was at fault in terminating the engagement. The court cited the following three reasons: 1) judicial holdings that

7

fault is an inappropriate concern in matters of family relations; 2) pragmatic difficulties in discerning fault when the conduct of both parties likely contributes to the failure of a relationship; and, 3) aversion to concepts of legal "rightness" and "wrongness" regarding the choice of a marriage partner. We agree, and affirm that judicial fault-finding is irrelevant and immaterial in the adjudication of matters of antenuptial gifting under existing law, absent fraud or deceit.

¶23 The District Court employed the "conditional gift" theory advanced by Albinger to determine present ownership of the disputed engagement ring. The theory holds that an implied condition of marriage attaches to the gift of a ring upon initial delivery due to the ring's symbolic association with the promise to marry and, when the condition of marriage fails, the incomplete gift may be revoked by the giver. Albinger urges this Court to affirm the District Court's conclusion that the ownership of an engagement ring remains with the one who gave the ring when plans to marry are called off.

¶24 Only in engagement ring cases does precedent from other jurisdictions weigh heavily for conditional gift theory in the absence of an expressed condition. *See collected cases*, Elaine Marie Tomko, Annotation, *Rights in Respect of Engagement and Courtship Presents when the Marriage Does Not Ensue* (1996)*, 44 A.L.R. 5th 1. *See also Benassi v. Back & Neck Pain Clinic, Inc*. (Minn. 2001), 629 N.W. 2d 475 ; *Meyer v. Mitnick* (Mich. 2001), 625 N.W.2d 136; *Lindh v. Surman* (Penn. 1999), 742 A.2d 643; *Heimann v. Parrish* (Kan. 1997), 942 P.2d 631; *Vigil v. Haber* (N.M. 1994), 888 P.2d 455. Considering it "unduly harsh and unnecessary" to require a hopeful suitor to express any condition upon which a ring might be premised, many courts stepped in to impute the condition of marriage. *Fierro v. Hoel* (Iowa 1990), 465 N.W.2d

8

669, 671.  In practice, courts presume the existence of the implied condition of marriage attaching to an engagement ring in the absence of an expressed intent to the contrary. *Fanning v. Iverson* (S.D. 1995), 535 N.W.2d 770; *Brown v. Thomas* (Wis. 1985), 379 N.W. 2d 868; *Lyle v. Durham* (Ohio 1984), 473 N.E. 2d 1216.  A party meets the burden of establishing the conditional nature of the gift by proving by a preponderance of the evidence that the ring was given in contemplation of marriage. *Fierro*, 465 N.W.2d at 671.  "Not only does this rule of law establish a 'bright line' for situations where the parties involved are unlikely to have considered the necessity of making an 'agreement to the contrary,' but the rule also eliminates the need for a trial court to attempt the often impossible task of determining which, if either, party is at fault."  *McIntire v. Raukhorst* (Ohio 1989), 585 N.E.2d 456, 458.

¶25     Since the issue of ring ownership when the engagement ends without marriage is a matter of first impression, we will briefly review early breach of promise jurisprudence, look to some American customs associated with engagement rings, analyze the judicial imputation of a condition in the context of Montana gift law, and examine conditional gift theory in light of the constitutional prohibition against gender bias.

*Abolition of Breach of Promise Actions*

¶26     Historic breach of promise jurisprudence tended to view an engagement ring as either a pledge of personal property given to secure a marital promise or as consideration for the contract of marriage. *See* 44 A.L.R. 5th 1, §§ 8 and 9.  When a contract to marry was abrogated, the jilted lover could seek redress in a breach of promise action that sounded in contract law, but availed the

9

plaintiff of tort damages. "The law allows punitive or vindictive damages to be assessed by the jury; and all the circumstances attending the breach before, at the time, and after may be given in evidence in aggravation of damages." *Dupont v. McAdow* (1886), 6 Mont. 226, 232, 9 P. 925, 928. The plaintiffs were almost invariably women seeking economic relief for themselves, compensation for pregnancy and material support for children of the relationship. Whatever "heart balm" was awarded to assuage lost love, ruined reputation or foreclosed opportunities to marry well "rest[ed] in the sound discretion of the jury." Section 8685, RCM (1935).

¶27 By the mid-1930's, several state legislatures questioned the efficacy of court "interference with domestic relations" and passed statutes barring actions for breach of promise to marry, alienation of affections, criminal conversation and other inappropriate conduct of the "private realm." *See* Rebecca Rushnet, *Rules of Engagement* (1998), 107 Yale Law Review 2583, 2586-91. Commentators noted all of these actions "afforded a fertile field for blackmail and extortion by means of manufactured suits in which the threat of publicity is used to force a settlement." W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* (5th ed. 1984) § 124 at 929. "There is good reason to believe that even genuine actions of this type are brought more frequently than not with purely mercenary or vindictive motives [and] that it is impossible to compensate for such damage with what has derisively been called 'heart balm.'" *Prosser and Keeton*, §124 at 929.

¶28 In the wake of "anti-heart balm" statutes that barred breach of contract to marry actions, courts heard a plethora of legal theories designed to involve them in settling antenuptial property disputes while avoiding the language of contract law. The results were mixed.

Some courts allowed actions in replevin. *See Vann v. Vehrs* (Ill. 2d Dist. 1994), 633 N.E.2d 102 (to reclaim property which the other party allegedly no longer has a right to possess). Others entertained claims for restitution and unjust enrichment. *See Wilson v. Dabo* (Ohio 1983), 461 N.E.2d 8 (to reclaim property transferred in reliance upon the promise to marry when the donor was the "non-breaching party"). Out of this legal morass, conditional gift analysis emerged as a popular way to resolve acrimonious engagement ring disputes. While some states pursue a fault-based determination for awarding the ring in equity, the modern wave aligns ring disposition with no-fault divorce property disposition and follows a bright-line rule of ring return.

*Engagement Ring Symbology*

¶29     The custom of giving expensive engagement rings is largely a mid- to late 20th Century phenomenon. Margaret F. Brinig, *Rings and Promises* (1990), 6 J.L. Econ. & Org. 203, 209. Nineteenth Century etiquette books struggled to identify proper gifts between men and women. Viviana A. Ziegler, *The Social Meaning of Money* (1994). Expensive or excessively intimate gifts, such as jewelry or wearing apparel, were fit for a kept woman, or perhaps a man's wife, but not as tokens of respectable courtship. *Ziegler,* at 99. Upper class men and women occasionally exchanged diamond rings as gifts during the 19th Century. *Ziegler,* at 99. The six-prong gold or platinum setting holding a raised, brilliant-cut diamond, which has become the classic engagement ring style, was created by Tiffany's in the 1870s. Anne Ward et al*., Rings Through the Ages* (1981), at 198. DeBeers' launched its national advertising campaign in 1939 that promised: "A diamond is forever." *Brinig*, at 206. To

11

cultivate a no-return custom in America, the cartel threatened to cut off supply to dealers who bought diamonds back from purchasers. *Brinig,* at 209. An interesting correlation exists between the mid-20th Century increase in demand for costly diamond engagement rings and the statutory changes by state legislatures to abolish the breach of promise action. *Brinig*, at 206. After the Second World War, expensive rings became not just symbols of love, but tangible economic commitments in themselves, and appear to have gained significance as other economic incidents of marriage were in flux. *See* Reva B. Siegel, *Modernization of Marital Status Law: Adjudicating Wives Rights to Earnings, 1860-1930* (1994), 82 Geo. L.J. 2127, 2201-03. As courts closed to women seeking damages for breach of the promise to marry, the cost and the practice of giving engagement rings rose dramatically. *Brinig*, at 209.

By the time Montana barred the breach of promise action, diamonds constituted over 80% of engagement ring sales. *Brinig*, at 205. Through the late 20th Century, rings remained personal tokens of affection; many couples who spurned the conventions of marriage still wore rings to bear witness to their union. *Ward,* at 146. Since 1980, however, engagement rings never exceeded 20% of diamond jewelry sales. *Brinig*, at 212.

¶30     This Court acknowledges the customary practice of presenting an engagement ring in conjunction with a promise to marry and we next examine the legal significance of that symbolic association in the context of Montana gift law.

*Conditional Gift Theory*

¶31     According to Montana law, "a gift is a transfer of personal property made voluntarily and without consideration." Section 70-3-101, MCA. The essential elements of an *inter*

12

*vivos* gift are donative intent, voluntary delivery and acceptance by the recipient. *Marens v. Newland* (1962), 141 Mont. 32, 39, 374 P.2d 721, 724 (*citing O'Neil v. O'Neil* (1911), 43 Mont. 505, 511, 117 P. 889, 890). Delivery, which manifests the intent of the giver, must turn over dominion and control of the property to the recipient. *In re Brown's Estate* (1949), 122 Mont. 451, 459, 206 P.2d 816, 821. Such a gift, made without condition, becomes irrevocable upon acceptance. *Marens*, 141 Mont. at 36, 374 P.2d at 723; *Fender v. Foust* (1928), 82 Mont. 73, 78, 265 P. 15, 16; *O'Neil v. O'Neil* (1911), 43 Mont. 505, 511, 117 P. 889, 890. When clear and convincing evidence demonstrates the presence of the essential elements of donative intent, voluntary delivery and acceptance, the gift is complete and this Court will not void the transfer when the giver experiences a change of heart. *See Gross v. Gross* (1989), 239 Mont. 480, 781 P.2d 284 (father barred from revoking a gift of real property transferred to his son).

¶32 Another essential element of a gift is that it is given without consideration. Section 70-3-101, MCA. A purported "gift" that is part of the inducement for "an agreement to do or not to do a certain thing," becomes the consideration essential to contract formation. Sections 28-2-101 and 28-2-102, MCA. An exchange of promises creates a contract to marry, albeit an unenforceable one. Section 27-1-412(2), MCA. When an engagement ring is given as consideration for the promise to marry, a contract is formed and legal action to recover the ring is barred by the abolition of the breach of promise actions. Section 27-1-602, MCA.

¶33 The only revocable gift recognized by Montana law is a gift in view of death. *See* §§ 70-3-

13

201, et. seq., MCA. Also known as a gift *causa mortis*, such a gift is subject to the following conditions: 1) it must be made in contemplation, fear or peril of death; 2) the giver must die of the illness or peril that he or she fears or contemplates; and 3) the delivery must be made with the intent that the gift will only take effect if the giver actually dies. Section 70-3-201, MCA; *Nelson v. Wilson* (1928), 81 Mont. 560, 570, 264 P. 679, 682; *O'Neil,* 43 Mont. at 511, 117 P. at 890. Statutory law provides that a gift in view of death may be revoked by the giver at any time and is revoked by the giver's recovery from the illness or escape from the peril under which the gift was made. Section 70-3-203, MCA.

¶34 Albinger maintains he held a reversionary interest in the gift of the engagement ring grounded in an implied condition subsequent. Montana law recognizes the transfer of personal property subject to an express or implied condition which must be satisfied before title vests, as either a contract, § 28-1-405, MCA, or as a gift in view of death, §§ 70-3-201, et. seq., MCA. Since actions stemming from breach of the contract to marry are barred by our "anti-heart balm" statute, Albinger urges the Court to adopt a conditional gift theory patterned on the law relevant to a gift in view of death. Under Montana law, no gift is revocable after acceptance except a gift in view of death. While some may find marriage to be the end of life as one knows it, we are reluctant to analogize gifts in contemplation of marriage with a gift in contemplation of death. This Court declines the invitation to create a new category of gifting by judicial fiat.

*Gender Bias*

¶ 38 Article II, Section 4 of the Montana Constitution recognizes and guarantees the

14

individual dignity of each human being without regard to gender. This Court and the Montana State Bar have recognized the harm caused by gender bias and sexual stereotyping in the jurisprudence and courtroom of this state. *In the Matter of the State Bar of Montana's Gender Fairness Steering Committee*, No. 90-231 (1990) (Petition and Order); *In re Marriage of Davies* (1994), 266 Mont. 466, 480-82, 880 P.2d 1368, 1378 (Nelson, J., concurring). In its Petition to the Supreme Court, the State Bar of Montana's Gender Fairness Steering Committee listed four forms of gender bias: a) denying rights or burdening people with responsibilities solely on the basis of gender; b) subjecting people to stereotypes about the proper behavior of men and women which ignore their individual situations; c) treating people differently on the basis of gender in situations in which gender should be irrelevant; and d) subjecting men or women as a group to a legal rule, policy, or practice which produces worse results for one group than the other.

¶ 39    The Montana Legislature made the social policy decision to relieve courts of the duty of regulating engagements by barring actions for breach of promise. While not explicitly denying access to the courts on the basis of gender, the "anti-heart balm" statutes closed courtrooms across the nation to female plaintiffs seeking damages for antenuptial pregnancy, ruined reputation, lost love and economic insecurity. During the mid-20th Century, some courts continued to entertain suits in equity for antenuptial property transfers. The jurisprudence that rose upon the implied conditional gift theory, based upon an engagement ring's symbolic associations with marriage, preserved a right of action narrowly tailored for ring givers seeking ring return. The bright-line rule of ring return on a no-fault basis, which

15

Albinger urges this Court to adopt, sets forth as a matter of law "proper" post-engagement behavior in regard to this single gifted item. The proposed no-fault adjudication of a disputed engagement ring also ignores the particular circumstances of a couple's decision not to marry.

¶ 40    Conditional gift theory applied exclusively to engagement ring cases, carves an exception in the state's gift law for the benefit of predominately male plaintiffs. Montana's "anti-heart balm" statute bars all actions sounding in contract law that arise from mutual promise to marry, absent fraud or deceit, and bars all plaintiffs from recovering any share of expenses incurred in planning a canceled wedding. While antenuptial traditions vary by class, ethnicity, age and inclination, women often still assume the bulk of pre-wedding costs, such as non-returnable wedding gowns, moving costs, or non-refundable deposits for caterers, entertainment or reception halls. Consequently, the statutory "anti-heart balm" bar continues to have a disparate impact on women. If this Court were to fashion a special exception for engagement ring actions under gift law theories, we would perpetuate the gender bias attendant upon the Legislature's decision to remove from our courts all actions for breach of antenuptial promises.

*Engagement Ring Disposition*

¶35    To preserve the integrity of our gift law and to avoid additional gender bias, we decline to adopt the theory that an engagement ring is a gift subject to an implied condition of marriage. Judicial imputation of conditional gifting would stake new legal territory in Montana. "It is not the province of this court or any other court to assume to legislate by judicial interpretation, and to

16

create in favor of any individual or any class of people an exception to the limitation set by the legislature." *Taylor v. Rann* (1938), 106 Mont. 588, 594, 80 P.2d 376, 379; *see also* Section 1-2-101, MCA.

¶36 The District Court found the engagement ring was voluntarily offered by Albinger on December 14, 1995, without consideration and with the present intent to voluntarily transfer dominion and control to Harris. Harris accepted the ring. Although the court implied a condition of marriage attaching to the gift as a matter of law, we do not. In our judgment, the gift was complete upon delivery, and a completed gift is not revocable. The fact that possession of the ring passed back and forth between Albinger and Harris during the course of their relationship bears no relevance to the issue of ring ownership. All of the elements of gifting must be present to transfer ownership, and the facts do not indicate re-gifting occurred. In fact, Albinger acknowledged Harris' ownership himself when he told Harris "to take the car, the horse, the dog and the ring" when she left the relationship. We hold that the engagement ring was an unconditional, completed gift upon acceptance and remains in Harris' ownership and control.

**Issue 2.**

¶37 *Did the District Court err in denying Albinger reimbursement for telephone charges incurred by Harris during cohabitation?*

¶38 The District Court found that Harris had been free to use the telephone and charge calls to Albinger's credit card throughout the relationship and Albinger paid the bills. Albinger seeks reimbursement for telephone charges incurred by Harris during the last month of their cohabitation. However, the record exhibits no proof by Albinger that he revoked Harris' telephone privileges and Albinger presents no legal theory for recovery. We conclude that the District Court's findings are not clearly erroneous and the court did not abuse its discretion in ruling that Albinger was not

17

entitled to reimbursement.

**Issue 3.**

¶39     *Did the District Court err in awarding Harris compensation for general damages resulting from an assault and battery by Albinger?*

¶40     Harris counter-claimed for personal injuries stemming from the severe beating she sustained on February 23, 1997, seeking $35,000 to cover medical and psychiatric treatment, lost wages, emotional distress, pain and suffering.  The District Court found Albinger admitted liability for the incident and paid Harris' resulting medical bills shortly after the incident.  Harris was not employed during the time she lived with Albinger, and the court found no evidence of lost earnings.  Noting that Harris failed to present evidence of past or anticipated psychiatric counseling needs and expenses, the court awarded Harris $2500 in general damages for emotional distress, pain and suffering.  Albinger appeals the award.

¶41     Once liability is established, it is the duty of the finder of fact to award damages for pain and suffering when the evidence clearly establishes that the plaintiff suffered painful injury and the defendant presents no evidence to the contrary.  *Thompson v. City of Bozeman* (1997), 284 Mont. 440, 446, 945 P.2d 48, 51*; Lee v. Kane* (1995),  270 Mont. 505, 514, 893 P.2d 854, 859; *Walls v. Rue* (1988), 233 Mont. 236, 236, 759 P.2d 169, 170 (*citing Gehert v. Cullinan* (1984), 211 Mont. 435, 439, 685 P.2d 352, 354).  This Court will not disturb an award of damages unless the amount awarded is so grossly out of proportion to the injury as to shock the conscience.  *Hansen v. Hansen* (1992), 254 Mont. 152, 159, 835 P.2d 748, 752;  *Frisnegger v. Gibson* (1979), 183 Mont. 57, 66, 598 P.2d 574, 579 (*citing Kelleher v. State* (1972), 160 Mont. 365, 375, 503 P.2d 29, 34-35).  The amount to be awarded is properly left to the finder of fact and this Court will not substitute its judgment unless we find the judgment to be the product of passion or prejudice.  *Frisnegger*, 183

18

Mont. at 67, 598 P.2d at 580 (*citing Salvail v. Great Northern Railway Co.* (1970), 156 Mont. 12, 31, 473 P.2d 549, 560). In personal injury actions there is no measuring stick by which to determine the amount of damages to be awarded for pain and suffering other than the intelligence of a fair and impartial trier of fact governed by a sense of justice; each case must of necessity depend upon its own peculiar facts. *Johnson v. United States* (D.C.Mont. 1981) 510 F.Supp. 1039, 1045 (*citing Pfau v. Stokke* (1945), 110 Mont. 471, 475, 103 P.2d 673, 674-75).

¶42     The record contains substantial and uncontroverted evidence that Harris endured numerous incidents of domestic violence during her relationship with Albinger. Harris testified that she experienced considerable pain, emotional distress and inconvenience as a result of the particularly severe beating she sustained on February 23, 1997. Brandishing a knife and threatening to cut off her finger, Albinger forcibly removed the ring from Harris' left hand, which resulted in permanent nerve damage. Albinger also pummeled Harris with a railroad lantern. Photographs, taken shortly after this incident and admitted into evidence without objection, document the bruises, swelling and abrasions on Harris's face, head, neck, shoulders and arms.

¶43     The clear weight of authority holds that any award that fails to include a sum for the general damages of pain, suffering and emotional distress is inadequate or inconsistent when the evidence in support is beyond controversy. The trial judge's assessment of $2500 for such damages certainly is not excessive and does nothing to "shock the conscience" of this Court. We hold that the District Court legitimately acted upon its legal duty to award general damages as part of its judgment in this case.

## CONCLUSION

¶44     We reverse the District Court's conclusion of law and hold the engagement ring to be a gift

19

given without implied or express condition. Montana gift law makes no provision for conditional gifting, except in the context of a gift in contemplation of death. We refrain from adopting permutations in the legal theory of gifting that have no legislated authority and serve to exacerbate gender bias. We affirm the court's denial of reimbursement for telephone charges and the monetary award for Harris' emotional distress, pain and suffering resulting from the assault and battery of February 23, 1997.

¶45  Reversed in part; affirmed in part; and remanded for entry of judgment consistent with this opinion.

/S/ JAMES C. NELSON

We Concur:

/S/ KARLA M. GRAY
/S/ JIM REGNIER
/S/ W. WILLIAM LEAPHART

Justice Terry N. Trieweiler concurring and dissenting.

¶46     Gender discrimination is a bad thing.  I am glad the majority is against it.  However, I regret that the majority has taken this opportunity to declare their good intentions because gender equity has about as much to do with this case as banking law.  Furthermore, the parties in the District Court will be as surprised to hear about the basis on which this appeal has been resolved as I was when I read the proposed opinion.  Principles of gender equity were never argued or even raised by the parties at any stage in the proceeding and the District Court had no opportunity to consider the relevance (or irrelevance) of Constitutional theory to any of the simple issues which were presented in the District Court.

¶47     The precedent established by this case leads to all sorts of interesting possibilities.  If we accept the majority's assumption that women are more likely to have to give back a conditional gift given in anticipation of marriage than men and that, therefore, traditional notions of gift law are no longer applicable because it is unfair, what should we do about maintenance?  After all, don't men more often pay maintenance than women?  Is that fair?  What should we do about child support?  Couldn't there be a statistical argument that men pay more child support than women?  What should we do about paternity suits?  Surely men are more frequently the defendants in paternity suits than women?

¶48     The simple fact is that if women are more likely to be the subject of an action to recover a conditional gift given in anticipation of a marriage which does not occur, it is because they are more frequently the recipient of the gift.  Should we just prohibit gifts in anticipation of marriage altogether because men are more likely to have to pay for them? The possible implications of the majority's decision are just beyond my comprehension.

¶49     Before today, no court anywhere in the world has ever held that a conditional gift given in

21

anticipation of marriage cannot be recovered if the condition on which it was given, the marriage, does not occur because to require its return would violate notions of gender fairness. Nowhere at any time. It is no wonder the parties did not think of it. Before embarking on this radical, unprecedented departure from traditional notions of contract and gift law, shouldn't we have at least asked the parties for their views? Shouldn't we at least have some record for the unfounded assumption that one gender is more likely to be affected than the other?

¶50 This is a simple case involving the law of conditional gifts, decided by the District Court based on findings which are fully supported by the evidence and law as it has been applied throughout the country. The District Court opinion is well reasoned and fair. It should be affirmed. Therefore, I dissent.

¶51 The District Court in Finding No. 6 found that the ring at issue in this case was referred to throughout the couple's relationship as an "engagement ring." It found in Finding No. 4 that the ring was presented to Michelle in contemplation of her marriage to Michael. The District Court found in Finding No. 7 that each time, except for the last time, the couple broke up (and they broke up frequently), the ring was either returned by Michelle or taken back by Michael. These findings were fully supported by the evidence. For example, Michael testified as follows:

> Q.  Now, when you gave her the engagement ring, were you contemplating that you were going to get married?
>
> A.  That was the whole idea.
>
> Q.  Was there any way in your mind that the engagement ring was just a ring and she could keep it whether you were married or not?
>
> A.  No.
>
> Q.  Is it correct that it was always in contemplation of marriage?
>
> A.  Yes.

22

Q.    Now, she testiifed that the engagement was on and off a couple of times at least; is that correct?

A.    Yes.

Q.    Okay.  At any of those times when the engagement was off and the ring – or excuse me, at any of those times that the engagement was off, was the ring delivered back to you?

A.    Yes.

Q.    Every time?

A.    Yes.

Q.    I guess with the exception of the time she got on the airplane?

A.    Right.  That would be, that would be the only time that I can recall.

¶52    It is equally clear from the record that the engagement ring was treated differently by the couple than other gifts which had been given by Michael to Michelle while they were engaged. He testified as follows:

Q.    Okay.  Now, you heard her testify, didn't you, about the other gifts you'd given her?

A.    Yes, I did.

Q.    The 1995 Mustang that cost about $24,000, was that in contemplation of getting married?

A.    No.

Q.    Have you ever made any demand that she return that to you?

A.    No.

Q.    How about the diamond earrings that were the Christmas gift?  Have you ever made any demands that she return those because they were given in contemplation of marriage?

A.    No.

23

Q.      How about the horse?

A.      No.

Q.      Any gift you gave her beside the engagement ring, did you ever contend that those other gifts were made in contemplation of marriage?

A.      No.  They were gifts.  Those are gifts.

¶53     The testimony of one witness is substantial evidence which is sufficient to support the findings of the District Court.  The District Court's findings in this case were clearly supported by substantial evidence and were not clearly erroneous.

¶54     Based on the District Court's findings, certain legal conclusions necessarily followed.  First, the District Court concluded that courts in other jurisdictions have analyzed similar cases based on the theory of "conditional gift;" that the occurrence of the anticipated marriage was a condition on which the gift was given; and that because the condition was not fulfilled, plaintiff was entitled to recovery of the gift.  The District Court was correct.  In an A.L.R. annotation directly on point, the author validates the District Court's position:

> A predominant theory used in ordering recovery of engagement gifts to the donor relies upon the theory of conditional gifts.  Many courts consider engagement gifts to be conditioned upon the subsequent marriage of the parties, and when such marriage does not take place, the condition has failed  and the donor is entitled to recover the engagement gift.  [Reference omitted.]

Elaine Marie Tomko, Annotation, *Rights in Respect of Engagement and Courtship Presents When Marriage Does Not Ensue,* 44 A.L.R. 5th 1, 18 (1996).

¶55     An example of a similar conclusion from another state is found at *Heiman v. Parrish* (Kan. 1997), 942 P.2d 631.  In that case, under identical circumstances, the Supreme Court of Kansas came to the following conclusion and cited the following authorities:

> In the absence of a contrary expression of intent, it is logical that engagement rings should be considered, by their very nature, conditional gifts given in contemplation of marriage.  Once it is established the ring is an engagement ring, it is a conditional gift.
>
> Other courts have reached a similar conclusion.  *See Simonian v. Donoian*, 96 Cal.App.2d 259, 215 P.2d 119 (1950); *White v. Finch*, 3 Conn. Cir. Ct. 138, 209

24

A.2d 199 (1964); *Gill v. Shively*, 320 So.2d 415 (Fla.App. 4 Dist. 1975); *Vann v. Vehrs*, 260 Ill.App.3d 648, 198 Ill.Dec. 640, 633 N.E.2d 102 (1994); *Harris v. Davis*, 139 Ill.App.3d 1046, 94 Ill.Dec. 327, 487 N.E.2d 1204 (1986); *Fierro v. Hoel*, 465 N.W.2d 669 (Iowa App. 1990); *Aronow v. Silver*, 223 N.J.Super. 344, 538 A.2d 851 (1987); *Mate v. Abrahams*, 62 A.2d 754 (N.J. County Ct. 1948); *Vigil v. Haber*, 119 N.M. 9, 888 P.2d 455 (1994); *Wion v. Henderson*, 24 Ohio App.3d 207, 494 N.E.2d 133 (1985); *Lyle v. Durham*, 16 Ohio App.3d 1, 473 N.E.2d 1216 (1984); *Spinnell v. Quigley*, 56 Wash.App. 799, 785 P.2d 1149 (1990); *Brown v. Thomas*, 127 Wis.2d 318, 379 N.W.2d 868.

*Heiman,* 942 P.2d at 634.

¶56    Second, the District Court concluded that it was irrelevant which party was at fault for breaking off the engagement. The District Court concluded that application of fault principles to the "conditional gift" theory is contrary to the modern trend and inconsistent with Montana law which disallows consideration of fault for even the dissolution of marriage. The District Court was also correct when it arrived at this conclusion. In the annotation previously cited, Tomko states:

> More recently, courts have declined to consider "fault" in looking at the broken engagement and have concluded that, without regard to fault, the donor is entitled to recover any engagement gifts made to the donee, in the absence of statute or special circumstances requiring the application of some paramount rule to the contrary. [Reference omitted.]

44 A.L.R. 5th at 20.

¶57    An example of the modern trend to disregard fault under circumstances such as those presented in this case is found at *Fierro v. Hoel* (Iowa Ct. App. 1990), 465 N.W.2d 669. In that case the plaintiff also sought return of an engagement ring following defendant's decision to break off the couple's engagement. The Iowa Court of Appeals concluded that an engagement ring given in contemplation of marriage is an impliedly conditional gift. *Fierro*, 465 N.W.2d at 672. The court recognized that an older line of cases limited a donor's recovery of the gift to situations where the engagement is dissolved by agreement or unjustifiably broken by the donee. However, the court concluded that the notion of one party being at blame for the termination of an engagement is

25

archaic and outdated. It cited the following language from *Aronow v. Silver* (N.J. Super. Ct. Ch.

Div. 1987), 538 A.2d 851, 853-54:

> What fact justifies the breaking of an engagement? The absence of a sense of humor? Differing musical tastes? Differing political views? The painfully-learned fact is that marriages are made on earth, not in heaven. They must be approached with intelligent care and should not happen without a decent assurance of success. When either party lacks that assurance, for whatever reason, the engagement should be broken. No justification is needed. Either party may act. Fault, impossible to fix, does not count.

*Fierro*, 465 N.W.2d at 672.

¶58    The Iowa court then concluded that:

> Like the *Aronow* court, this court believes fault, in an engagement setting, is irrelevant. We reject this "fault" approach.
>
> This court adopts the "no fault" approach followed in a minority of jurisdictions. *E.g., Brown v. Thomas*, 127 Wis.2d 318, 379 N.W.2d 868 (App. 1985). "Since the major purpose of the engagement period is to allow a couple time to test the permanency of their feelings, it would seem highly ironic to penalize the donor for taking steps to prevent a possibly unhappy marriage . . . ." *Gaden v. Gaden*, 29 N.Y.2d 80, 88, 323 N.Y.S.2d 955, 962, 272 N.E.2d 471, 476 (1971).

*Fierro*, 465 N.W.2d at 672.

¶59    Finally, the District Court concluded that § 27-1-602, MCA (referred to in the majority

opinion as Montana's "heart balm" statute), is not applicable in an action to recover a gift made in

contemplation of marriage. The District Court noted that the majority of jurisdictions have held that

"heart balm" statutes bar actions for damages, such as humiliation, which arise as a consequence of

breaching a promise to marry but have no effect with regard to recovery of gifts. Once again, the

District Court was correct. In the Tomko annotation relied upon in most recent cases and cited by

both parties in this case, she states:

> In a number of states, the breach-of-promise action has been abolished, though it has generally been held that the recovery of engagement gifts does not fall among the barred actions. Statutes abolishing breach-of-promise suits are commonly

26

referred to as "heart balm" statutes because they permit the former lovers' heartaches to heal without recourse to the courts. The purpose of the heart balm statutes was originally "to avert the perpetration of fraud by adventurers *or adventuresses* who were prone to use the threat of a breach of promise of marriage action to compel overapprehensive and naive defendants to make lucrative settlements in order to avoid embarrassing and lurid notoriety which accompanied litigation of this character." Most courts will not use these statutes, however, to protect a party who received an engagement gift under fraudulent circumstances, or where a conditional gift theory is to be applied. [Emphasis added.]

44 A.L.R. 5th at 27.

¶60    An example of the type of decision referred to in Tomko's annotation is *Pavlicic v. Vogtsberger* (Pa. 1957), 136 A.2d 127, 130, in which the Pennsylvania Supreme Court held that that state's "Heart Balm Act," while abolishing causes of action for breach of contract to marry, "in no way alters the law of conditional gifts."

¶61    What has been said so far in this Opinion is all that was necessary in order to resolve the issues presented to the District Court and to this Court on appeal. The District Court's findings were supported by substantial evidence and were not clearly erroneous. The District Court's conclusions of law were correct.

¶62    However, the majority is not content to review the issues presented based on the facts which were proven and the legal authorities which have been submitted. The majority instead, without any factual basis in the record, explores what it finds are "some American customs associated with engagement rings" and turns this simple property dispute based on traditional rules of gift law into a battle of the sexes with constitutional implications. Considering the significance we have now attached to this case, does it strike anyone else as odd that we haven't asked the parties for any input on these critical issues?

¶63    The practical problems arising from the majority's impulsiveness become quickly apparent. For example, a predicate to its gender inequity approach is its conclusion that "anti-heart balm"

27

statutes have "closed courtrooms across the nation to female plaintiffs seeking damages." What is the factual basis for assuming that women are more likely to seek damages for breach of a promise to marry than men? Tomko's annotation would suggest that gender is not a factor. She states that the purpose of heart balm statutes was originally "to avert perpetration of fraud by adventurers or adventuresses . . . ." 44 A.L.R. 5th at 27. There is no authority provided for the quantum leap taken by the majority. It must be so simply because the majority says so.

¶64    The next step in the majority's shaky syllogism is its unsupported conclusion that "[c]onditional gift theory applied exclusively to engagement ring cases carves an exception in the state's gift law for the benefit of predominantly male plaintiffs." Furthermore, the majority states that while "Montana's 'anti-heart balm' statute . . . bars all plaintiffs from recovering any share of non-refundable expenses incurred in planning a cancelled wedding," it assumes that women usually incur these expenses. The majority's conclusion from these unsupported assumptions is that, therefore, we cannot, in fairness, enforce conditional gift law when it pertains to engagement rings.

¶65    First of all, either gender can given an engagement ring. For example, in *Vigil v. Haber* (N.M. 1994), 888 P.2d 455, the parties exchanged engagement rings. However, their relationship deteriorated, the couple separated, and following their separation a hearing examiner determined that the parties should return the rings they had given each other. The plaintiff immediately returned the ring he had along with other of the defendant's possessions. However, the defendant objected to returning the engagement ring that had been given to her. The New Mexico Supreme Court held that the ring was a conditional gift dependant on the parties' marriage and should be returned. *Vigil*, 888 P.2d at 458. What if the roles had been reversed and the woman had returned the engagement ring given to her but the man had refused to do so? According to this Court, she would not be allowed to recover the engagement ring that she had given to her fiancé, no matter how substantial

28

the value and unfair the result because requiring the return of engagement rings is unfair to women.

¶66    The second problem with the majority's assumptions is the assumption that conditional gift law as it relates to gifts exchanged in anticipation of marriage only applies to wedding rings. It does not. For example, in *Pavlicic,* a case which disproves the theory that jurisprudence cannot be written in readable prose, the plaintiff was a 75-year-old man when the 26-year-old defendant asked for his hand in marriage. While he first protested on the basis of his age, she assured him that she was no longer interested in "young fellows" and prevailed upon him to make the commitment. Over the course of the next four years, she then prevailed upon him to pay the mortgage on her home, buy her two new cars, an engagement ring, a diamond for her mother's ring, remodel her house, and advance her $5000 to purchase a saloon which they could jointly operate. The problem was that after she received the money for the saloon, she disappeared. She was next seen in another town operating Ruby's bar and married to a man two years her junior. As noted by the Pennsylvania Supreme Court:

> When George emerged from the mists and fogs of his disappointment and disillusionment he brought an action in equity praying that the satisfaction of the mortgage on Sara Jane's property be stricken from the record, that she be ordered to return the gifts which had not been consumed, and pay back the moneys [sic] which she had gotten from him under a false promise to marry.

*Pavlicic*, 136 A.2d at 129.

¶67    The Pennsylvania Supreme Court held that George's action was not barred by the state's "Heart Balm Act" and that all gifts, not just the wedding ring, were conditional gifts in anticipation of marriage which must be returned or repaid. The Pennsylvania Supreme Court cited *Stanger v. Epler* (1955), 115 A.2d 197, 199, stating:

> A gift to a person to whom the donor is engaged to be married, made in contemplation of marriage, although absolute in form, is conditional; and upon breach of the marriage engagement by the donee the property may be recovered by

29

the donor. See also 38 C.J.S. Gifts § 61.

*Pavlicic*, 136 A.2d at 131.

¶68 The point is that there is no reason to limit the law of "conditional gifts" in anticipation of marriage to engagement rings. There is precedent for applying it to all gifts in anticipation of marriage and had either of the parties had any forewarning that this Court would have launched into the gender equity issue on which it bases its opinion, they could have pointed that out.

¶69 Also predicate to the majority's decision is its conclusion that the District Court implied that marriage was a condition to the gift. However, as previously noted, the Court implied no such thing. The Court made a finding that the gift was given in anticipation of marriage based on the testimony that was presented. The majority has simply chosen, as a matter of law, to ignore those facts in favor of the social theory it has chosen to impose on the parties and the people of this state without the benefit of input from anyone else.

¶70 I concur with the Court's conclusions that the District Court did not err when it held that Albinger was not entitled to reimbursement for Harris' telephone calls and when it awarded Harris damages for her pain and suffering.

¶71 However, I object to the gender stereotypes on which the majority Opinion is based and without which the majority could not have arrived at their legal conclusion, and I object to the majority's trivialization of something as important as equal rights by attaching them to the simple dispute involved in this case.

¶72 I dissent from the majority's conclusion that Montana, unlike any other jurisdiction which has considered this issue, should not apply traditional "conditional gift" or contract law to the resolution of the dispute between the parties. I dissent from the majority's interesting but inapplicable and factually unsupported social commentary and its interjection and ultimate reliance on constitutional

30

theory which was never raised by any party, never considered by the District Court, and on which neither party had an opportunity to comment. The Opinion is based on sexual stereotypes, false assumptions unsupported by the record, constitutional theory never raised or considered by the parties or the District Court, and social theory that has nothing to do with the case as it was considered by the District Court or developed by the parties. In short, it breaks just about every rule of appellate decision- making.

¶73     I dissent from the majority's transformation of a simple case involving gift law to a soap box on which to analyze social customs and significant constitutional rights which have now been trivialized by their interjection in this case.

/S/ TERRY N. TRIEWEILER