223 N.J. Super. 344 (1987)
538 A.2d 851
PHILIP ARONOW, PLAINTIFF,
v.
ELIZABETH SILVER, DEFENDANT.
ROBERT SILVER AND CYBIL SILVER, HIS WIFE, THIRD-PARTY PLAINTIFFS AND INTERVENORS,
v.
PHILIP ARONOW, DEFENDANT.
Superior Court of New Jersey, Chancery Division Burlington County.
Decided November 17, 1987.
*346 Robert J. Adinolfi, for plaintiff and third-party defendant.
Joseph M. Pinto, for defendant and third-party plaintiffs-intervenors (Joseph M. Polino, P.A. attorney).
HAINES, A.J.S.C.
Philip Aronow, plaintiff, and Elizabeth Silver, defendant, were engaged to be married. The engagement was a stormy one. Problems arose involving the parties themselves and their relatives. On three occasions, Elizabeth cancelled the engagement and returned the engagement ring, only to recant. Finally, with the marriage ceremony a few days away, the engagement was broken irretrievably. Each party, in this resulting litigation, faults the other. Each claims the engagement ring, certain shares of stock and a jointly-owned condominium. Robert and Cybil Silver, Elizabeth's parents, seek reimbursement for various wedding expenses incurred by them. This opinion, which follows a trial of the liability issues, concludes (1) that Philip is entitled to the engagement ring and the condominium; (2) that he has no liability to the parents, and (3) that the stock transactions require adjustments.[1]

A. The Law Concerning Engagement Rings

The majority rule in this country concerning the disposition of engagement rings is a fault rule: the party who unjustifiably breaks the engagement loses the ring. The minority rule rejects fault. See Annotation, "Rights in Respect of Engagement and Courtship Presents When Marriage Does Not Ensue," *347 46 A.L.R.3d 578 (1972); Annotation, (same title), 24 A.L.R.2d 579 (1952); 38 C.J.S., Gifts, Sec. 61. New Jersey courts have considered the question in only four published opinions, with split results. This court, not bound by any of those opinions, joins the minority.
Our earliest case is Sloin v. Lavine, 11 N.J. Misc. 899 (Sup.Ct. 1933), in which the court, citing the law of foreign jurisdictions, said:
So we have on the merits the simple case of an engagement ring and engagement broken and ring not returned. The decisions are not numerous, but we follow those holding what we deem the correct rule, viz., that such a gift is impliedly conditional, and must be returned, particularly when the engagement is broken by the donee, as the court was entitled to find in this case. [at 900]
Sloin's implication that the person who breaks the engagement loses the ring was rejected by Judge (later Justice) Sullivan in Albanese v. Indelicato, 25 N.J. Misc. 144 (D.Ct. 1947). The decision involved ownership of an engagement ring and a dinner ring. The court said:
As far as the engagement ring is concerned, the defendant had no right to keep it. An engagement ring is a symbol or pledge of the coming marriage and signifies that the one who wears it is engaged to marry the man who gave it to her. If the engagement is broken off the ring should be returned since it is a conditional gift. True, no express condition was imposed but the law implies a condition because of the symbolic significance of the ring. It does not matter who broke the engagement. A person may have the best reasons in the world for so doing. The important thing is that the gift was conditional and the condition was not fulfilled.
The giving of the dinner ring is an entirely different proposition. True, it was given after the parties became engaged. No doubt plaintiff would not have given the ring to defendant if they had not been engaged. The dinner ring though, has no symbolic meaning and is only a token of the love and affection which plaintiff bore for the defendant. Many gifts are made for reasons that sour with the passage of time. Under the law though, there is no consideration required for a gift and it is absolute once made unless a condition is imposed. There was no express condition here and the law will not imply one as in the case of the engagement ring since the dinner ring has no symbolic meaning attached to it. Defendant was under no obligation to return the dinner ring. [at 144-145; citations omitted]
Albanese cited Sloin and a Pennsylvania case.
In the next case, Mate v. Abrahams, 62 A.2d 754 (N.J.Cty.Ct. 1948), the court imposed a fault standard, saying:

*348 In short, both on reason and authority, an engagement ring, being given as a symbol or pledge of a mutual agreement to marry, can be recovered by the man, if that agreement is dissolved by mutual consent, or the woman unjustifiably breaks off the engagement, but cannot be recovered by him, if he unjustifiably breaks the agreement it evidences. [at 755]
Mate cited general authorities and cases from other jurisdictions, quoting from Jacobs v. Davis, 2 K.B. 332 (1917), referred to as "the leading case", as follows:
Though the origin of the engagement ring has been forgotten, it still retains its character of a pledge or something to bind the bargain or contract to marry, and it is given on the understanding that a party who breaks the contract must return it. [quoted at 755]
The final case, Beberman v. Segal, 6 N.J. Super. 472 (Law Div. 1949), adopts the fault standard, citing Mate.
The fault rule is sexist and archaic, a too-long enduring reminder of the times when even the law discriminated against women. The history is traced in 24 A.L.R.2d at 582-586. In ancient Rome the rule was fault. When the woman broke the engagement, however, she was required not only to return the ring, but also its value, as a penalty. No penalty attached when the breach was the man's. In England, women were oppressed by the rigidly stratified social order of the day. They worked as servants or, if not of the servant class, were dependent on their relatives. The fact that men were in short supply, marriage above one's station rare and travel difficult abbreviated betrothal prospects for women. Marriages were arranged. Women's lifetime choices were limited to a marriage or a nunnery. Spinsterhood was a centuries-long personal tragedy. Men, because it was a man's world, were much more likely than women to break engagements. When one did, he left behind a woman of tainted reputation and ruined prospects. The law, in a de minimis gesture, gave her the engagement ring, as a consolation prize. When the man was jilted, a seldom thing, justice required the ring's return to him. Thus, the rule of life was the rule of law  both saw women as inferiors.
*349 To accept the ancient rule of law is to ignore our constitutional insistence upon the equality of women, to further the unfortunate reality that society still discriminates. That reality is one which courts must not promote. Our obligation is to enforce the law, which bars discrimination. By doing so we move reality in the right direction.
The majority rule, even without its constitutional infirmity, will not withstand elementary scrutiny. Its foundation is fault, and fault, in an engagement setting, cannot be ascertained.
What fact justifies the breaking of an engagement? The absence of a sense of humor? Differing musical tastes? Differing political views? The painfully-learned fact is that marriages are made on earth, not in heaven. They must be approached with intelligent care and should not happen without a decent assurance of success. When either party lacks that assurance, for whatever reason, the engagement should be broken. No justification is needed. Either party may act. Fault, impossible to fix, does not count. Albanese is correct in saying: "It does not matter who broke the engagement. A person may have the best reasons in the world for so doing. The important thing is that the gift was conditional and the condition was not fulfilled." 25 N.J. Misc. at 145.
Our Legislature, recognizing the inability to determine fault when marriages fail, wisely adopted our no-fault divorce statute, N.J.S.A. 2A:34-2. Surely the concept of no fault divorce must have as its predicate the concept of no-fault engagements. This is the reasoning followed in the only two states (other than New Jersey if Albanese is the law) adopting the minority rule, Wisconsin and Ohio. Brown v. Thomas, 127 Wis.2d 318, 379 N.W.2d 868 (Wis. Ct. App. 1985), held that the policy of the no-fault divorce law applies equally to broken engagements. The same philosophy appears in Lyle v. Durham, 16 Ohio App.3d 1, 473 N.E.2d 1216 (Ohio Ct. App. 1984):
In many cases, however, there is no real fault. "* * * [O]ne or both of the parties merely changes his mind about the desirability of the other as a *350 marriage partner * * *" Gaden v. Gaden (1971), 29 N.Y.2d 80, 88, 323 N.Y.S.2d 955, 272 N.E.2d 471. Because a primary purpose of the engagement period is to "* * * allow a couple time to test the permanency of their feelings, * * *" we question the wisdom of penalizing the donor for acting to prevent what may be an unhappy marriage. Id. at 88, 323 N.Y.S.2d 955, 272 N.E.2d 471. [at 473 N.E.2d 1218]
Philip's gift of a ring to Elizabeth was conditioned upon marriage. When the promise of marriage was not kept, regardless of fault, the condition was not fulfilled and the ring must be returned to him.[2]

B. Other Gifts

An unconditional inter vivos gift is final, even in an engagement setting. In Gerard v. Distefano, 84 N.J. Super. 396 (Ch.Div. 1964), for example, the court found insufficient evidence to prove that a ring, supposedly given as an engagement ring, was so intended. It said, "[t]herefore, this court finds that it was a gift inter vivos and need not be returned." Id. at 403. A conditional gift, however, must be returned if the condition is breached. Albanese.
During their engagement, Philip and Elizabeth purchased a condominium which they intended to be their future home. They took title in both names, thus becoming tenants in common. Philip moved into the property one day before the engagement was broken, November 24, 1986, and has lived there ever since. Elizabeth has never lived there. The implication that the arrangement was conditioned upon marriage is inescapable. Nothing suggests that the purchase amounted to a joint investment for other than marriage purposes. The condominium must be treated in the same manner as the engagement ring: as a conditional gift to the extent that one co-tenant contributed more toward the purchase price than the other.
*351 The testimony covering contributions is in dispute. Elizabeth claims she gave Philip $1,500 toward the purchase price on the day of the settlement. Philip claims she contributed nothing. All other payments, including payments on the mortgage executed by both at settlement, were made by Philip. Resolution of the $1,500 issue depends upon the credibility of the parties. This requires an examination of the testimony, including those aspects dealing with the breaking of the engagement, not for the purpose of fixing fault but for the purpose of determining truth.
Philip testified that shortly before the wedding date difficulties had arisen involving his mother and Elizabeth. He called Elizabeth to discuss them. She responded by saying that she saw no hope of the marriage working and was calling it off, immediately hanging up the telephone. Philip, disturbed and uncertain as to what he should do, promptly called her back. She again hung up without discussion. A third call produced the same result. Thus ended the relationship.
Elizabeth testified to the contrary. She agreed Philip called her but said that he terminated the engagement because he thought the marriage was unworkable. She admitted hanging up the telephone but considered it a natural reaction to a distressing message. She also acknowledged that Philip made two immediately-following telephone calls in response to both of which she hung up the telephone. She did so she said because she did not want to talk to someone who had just broken her engagement.
Elizabeth's story is not believable. It is not likely that Philip would call her, break the engagement, and then call twice more to repeat or discuss that painful news. It is more likely that he made the subsequent calls because he was disturbed by Elizabeth's message and uncertain of its finality, especially since she had broken the engagement three times before.
Other facts attest to Philip's truthfulness. He made arrangements to have some of Elizabeth's belongings and his own *352 moved into the condominium on the day before the engagement was broken. The move was not one made by a man about to end his engagement. A few minutes before he called Elizabeth he tried to reach her father by telephone to advise him that a proposed parental meeting could not be arranged. What fiance would attempt to call his prospective father-in-law for that purpose immediately before breaking his engagement? According to Elizabeth the $1,500 in cash she contributed on the morning of the condominium settlement represented gambling winnings of her father, who gave the money to her. Her father corroborated the story. However, no documentary evidence of any kind was presented by Elizabeth or her father to support the supposed transaction. The accounting document reflecting the financial arrangements made at settlement makes no mention of any contribution by her. Philip, as a witness, was direct, convincing and unshaken by any cross-examination. Elizabeth was less impressive. It is my conclusion, based on this analysis, that Elizabeth made no contribution to the purchase price of the condominium.
Equitable consequences follow this finding. Technically, the property must be partitioned. In good conscience it belongs to Philip, provided that Elizabeth is relieved of liability on the mortgage. The inherent power of the court to shape a partition decision in a way that does equity is recognized in Newman v. Chase, 70 N.J. 254 (1976):
But partition is also an ancient head of equity jurisdiction, an inherent power of the court independent of statutory grant. (Citations omitted). In the exercise of this power our courts of equity have not hesitated to exercise discretion as to the particular manner in which partition is effected between the parties. "It is an established principle that a court of equity, in decreeing partition, does not act ministerially and in obedience to the call of those who have a right to the partition, but founds itself on its general jurisdiction as a court of equity, and administers its relief ex aequo et bono according to its own notions of general justice and equity between the parties." Woolston v. Pullen, 85 N.J. Eq. 35, 40 (Ch. 1917). [at 263]
Our State accepts the principle of owelty, described in Leonard v. Leonard, 124 N.J. Super. 439 (App.Div. 1973), a partition proceeding, as follows:

*353 ... if one cotenant receives property with a value greater than his proportionate share, he will owe to the other cotenant an amount of money which would equalize the partition. [at 442-443]
In the present case this principle can be satisfied if Philip receives the entire title, but is required to satisfy Elizabeth's mortgage obligation.
A non-binding but instructive case with facts very similar to those before this court is Reitmeier v. Kalinoski, 631 F. Supp. 565 (D.N.J. 1986). After reviewing New Jersey law, the federal court concluded that the entire title to a disputed parcel of real estate should be placed in one litigant. It relied upon the principle of owelty to equalize differences in value. The property in Reitmeier, like the property here, was encumbered by a mortgage on which the party not receiving title was liable. This liability was satisfied by the court in the following manner:
The court will direct plaintiff to assume the mortgage.... [at 581-582]
....
Plaintiff is directed to make a good faith effort to reformulate the mortgage as to the property to exclude defendant from liability thereon and, if necessary, to secure an alternate surety. [at 583]
It is not fair, in the present case, to leave Elizabeth in an uncertain liability position. Philip, therefore, is directed not only to assume the mortgage, but also to remove any obligation of Elizabeth with respect to it. He must do so within 150 days, absent which the condominium is to be sold and any mortgage deficiency resulting from the sale paid by Philip. The terms of such sale will be fixed by this court on application of either Philip or Elizabeth. When, and if, Philip satisfies Elizabeth's mortgage obligation without sale, her interest in the property is to be conveyed to Philip. That may be accomplished by the execution of a deed by Elizabeth or a master appointed by this court for that purpose or through a self-executing recordable order of this court.

C. The Stock Purchases

During their engagement, the parties, in anticipation of their marriage, purchased stock with Philip's money upon *354 the understanding that the stock certificate was to be placed in joint names. The broker, however, had the certificate issued in Elizabeth's name only. She sold it without Philip's knowledge after the engagement was broken and kept the proceeds. Other stock previously owned by Elizabeth was placed in joint names. That stock has not been sold. Quite clearly, these stock arrangements were conditioned upon marriage. When the engagement was broken, the stocks should have been returned to the parties who donated them. Philip's stock should not have been sold and Elizabeth must pay the proceeds of the sale to him. Philip is directed to transfer his interest in the jointly-held stock to Elizabeth.

D. The Father's Expenses

Robert and Cybil Silver, Elizabeth's parents, seek the recovery of various wedding expenses paid by them. They claim that Philip is responsible. No supportable legal theory has been advanced by them, however, upon which their claim can be premised and no testimony produced to indicate any arrangement, contractual or otherwise, between the parents and Philip which would make him liable. The Silvers cannot recover.
NOTES
[1] The use of first names can be unseemly. Engaged couples, however, are frequently so addressed. Here the usage simplifies while advancing clarity and avoiding the impersonality of the last-name-only approach.
[2] The instant suit is not barred by N.J.S.A. 2A:23-1 et seq. which abolishes rights of action for breach of contract to marry. It is a suit to recover conditional gifts, not a suit for damages. Morris v. MacNab, 25 N.J. 271, 275 (1957).