SUPREME JUDICIAL COURT 
 
 BRUCE JOHNSON vs. CAROLINE SETTINO

 
 Docket:
 SJC-13555
 
 
 Dates:
 September 6, 2024 - November 8, 2024
 
 
 Present:
 Budd, C.J., Gaziano, Kafker, Wendlandt, Georges, & Dewar, JJ.
 
 
 County:
 Plymouth
 

 
 Keywords:
 Marriage. Gift. Practice, Civil, Retroactivity of judicial holding, Interest. Retroactivity of Judicial Holding. Damages, Interest. Interest.
 
 

      Civil action commenced in the Superior Court Department on January 16, 2018.
     The case was heard by Brian S. Glenny, J., and a motion to
alter or amend the judgment also was heard by him.
     After review by the Appeals Court, 103 Mass. App. Ct. 291 (2023), the Supreme Judicial Court granted leave to obtain further appellate review.
     Stephanie Taverna Siden for the plaintiff.
     Nicholas J. Rosenberg for the defendant.
WENDLANDT, J.  This case presents the question whether the issue of "who is at fault" should continue to govern the rights to engagement rings given in contemplation of marriage when the anticipated wedding does not come to pass.  More than six decades ago, we recognized that an antenuptial ring generally is understood to be a conditional gift and determined that the donor may recover the ring following a failed engagement, but only if the donor was "without fault."  De Cicco v. Barker, 339 Mass. 457, 458 (1959).  We now join the modern trend adopted by the majority of jurisdictions that have considered the issue and retire the concept of fault in this context; where, as here, the planned wedding does not ensue and the engagement is ended, the engagement ring must be returned to the donor regardless of fault.  Further concluding that the same rule applies to the wedding band the donor, Bruce Johnson, gave to the donee, Caroline Settino, and that prejudgment interest on Settino's counterclaim was miscalculated, we reverse in part and remand for recalculation of prejudgment interest.
1.  Background.  a.  Facts.  We set forth the facts as found by the trial judge following the jury-waived trial, each of which is supported by the record.  See Wendy's Old Fashioned Hamburgers of N.Y., Inc. v. Board of Appeal of Billerica, 454 Mass. 374, 383 (2009), quoting DiGiovanni v. Board of Appeals of Rockport, 19 Mass. App. Ct. 339, 343 (1985) (trial judge's findings "will not be set aside unless they are 'clearly erroneous' or there is 'no evidence to support them'").  
In the summer of 2016, Johnson met Settino.  The two started dating.  Over the next year, they traveled together, visiting New York, Bar Harbor, the Virgin Islands, and Italy.  Johnson paid for these vacations, expecting nothing in return.  Johnson also showered Settino with lavish gifts of jewelry, clothing, shoes, and handbags.  It was customary for Johnson to give Settino the receipts for these gifts.  
Johnson also helped Settino with certain medical expenses.  For example, after Settino told him that she was considering dental implant surgery, Johnson agreed to pay for the procedure, which consisted of two parts.  He paid for the first part, during which her upper teeth were extracted.  
The couple started looking at engagement rings.  Eventually, Johnson bought a $70,000 diamond engagement ring.  He gave the receipt for the ring to Settino.
In August 2017, Johnson asked Settino's father for permission to marry her.  Later that month, Johnson asked Settino to marry him, presenting her with the diamond engagement ring at a prearranged dinner at a restaurant on Cape Cod.  Settino accepted the proposal and the ring; the happy couple was greeted by applause by fellow restaurant patrons.  
In October 2017, Johnson purchased two wedding bands at a cost of approximately $3,700.  He gave both bands, and the receipt, to Settino.  The couple proceeded to make plans for their wedding, which they set for September 2018.  
Soon, however, Johnson began to notice certain of Settino's behaviors that he found to be troubling; Settino, in his view, was becoming increasingly critical and unsupportive of him.  She repeatedly called him a "moron," treated him like a child, complained about how he used his cellular telephone, and berated him over spilled drinks.  She did not accompany him to treatments when he was diagnosed with prostate cancer.  If something went wrong, Settino blamed Johnson.  When the couple quarreled, Settino would yell at Johnson and storm away on the few occasions that Johnson defended himself.  Johnson also began to feel as though Settino did not appreciate his accomplishments.  Still, Johnson did not consider canceling the planned nuptial.  
Then, one evening in November 2017 following an argument between the couple, Settino made a comment to the effect that she "was a good-looking woman, and she could get a man whenever she wanted."  Settino stormed off to bed, leaving her cellular telephone behind.   
Troubled by Settino's statement, Johnson looked at Settino's cellular telephone and discovered a message from Settino to a man whom Johnson did not know.  The message stated:  "My Bruce is going to be in Connecticut for three days.  I need some playtime."  His interest piqued, Johnson continued to peruse Settino's cellular telephone; he found additional messages from the man, including one voice mail message in which the man referred to Settino as "cupcake" and lamented that the two did not see each other often enough.   
      Johnson, whose first marriage ended on account of infidelity, confronted Settino the next morning.  Settino explained that the man was a long-time friend and denied any sexual affair with the man.  Johnson, however, remained troubled by this previously undisclosed friend in Settino's life.  
In the two weeks that followed, Johnson took stock of his entire relationship with Settino.  Thereafter, Johnson ended the engagement.  Settino kept the engagement ring and wedding bands.  For his part, although he had promised to do so prior to the break up, Johnson failed to pay for the second part of Settino's dental implant surgery.
b.  Prior proceedings.  Johnson brought the present action to recover the engagement ring and the wedding bands.  Seven months later, Settino filed a counterclaim for the costs of the second half of the dental procedure for which Johnson had promised to pay.
Following a jury-waived trial, the trial judge found that Johnson gave, and Settino accepted, the engagement ring and the wedding bands "in anticipation of marriage."  The judge also found that Settino and the man with whom she was communicating had been friends for over forty years, that they were not romantically involved, and that Johnson "failed to show by a preponderance of the evidence that Settino was having a sexual affair."  
Based on these findings, the judge concluded that Johnson was "responsible" for ending the engagement -- a choice, the judge determined, that was "made solely by Johnson."  Although the judge credited Johnson's testimony regarding Settino's increasingly critical and unsupportive conduct following the couple's engagement, the judge determined that Johnson's decision to end the engagement was based on his mistaken belief that Settino was having an affair.  
Rejecting Johnson's argument that any "fault" analysis must include a determination whether his actions were reasonable, the judge determined that Johnson "must bear the fault for the breakup of this engagement."  The judge concluded that Settino was entitled to keep the engagement ring, reasoning that "Johnson mistakenly thought Settino was cheating on him and called off the engagement, something Settino neither sought nor wanted."  He also awarded one wedding band to Johnson and one to Settino.[1]
With regard to Settino's counterclaim,[2] the judge found that Johnson had promised to pay for the dental procedure, including the second part of the procedure, and that Settino had relied to her detriment by undergoing the initial extraction procedure.  He awarded damages in favor of Settino and calculated prejudgment interest from the date of the filing of Johnson's complaint, rather than from the date of the filing of Settino's counterclaim.[3]
On appeal, a divided panel of the Appeals Court reversed.  Johnson v. Settino, 103 Mass. App. Ct. 291, 303-304 (2023).  Noting that appellate courts in the Commonwealth have not addressed how fault should be assessed in these circumstances, and that even among our sister jurisdictions there is an absence of any legal standard by which a fact finder can adjudge the culpability or fault in a prenuptial breakup,[4] the majority concluded that, contrary to the trial judge's determination, a party who ends an engagement is not necessarily the one to blame for that result.  Id. at 300.  Instead, an assessment of "fault" requires a justification analysis.  Id.  Applying this legal standard to the judge's factual findings, the majority concluded that Johnson was not "at fault" for the end of the engagement because his actions were reasonable, despite his mistaken suspicions of Settino's affair.  Id. at 301.  Accordingly, the Appeals Court remanded the matter for entry of a judgment in Johnson's favor on the engagement ring and wedding band.  Id.
With regard to the dental procedure, the court concluded that the trial judge erred in allowing prejudgment interest from the date of the complaint and remanded for recalculation of prejudgment interest from the date of Settino's counterclaim.  Id. at 303.  Settino sought further appellate review, which we allowed.
2.  Discussion.  a.  Standard of review.  This case presents a question of law, which we review de novo.  Jinks v. Credico (USA) LLC, 488 Mass. 691, 696 (2021). 
b.  Fault.  More than sixty years ago, in De Cicco, 339 Mass. at 458, we addressed the question whether the so-called "heart balm act," G. L. c. 207, § 47A, inserted by St. 1938, c. 350, § 1,[5] prohibited a donor's action for return of an engagement ring after the donee broke the engagement.  We concluded that the act, which abolished causes of action for breach of contract to marry, did not preclude the donor's action based on equitable principles of restitution of property held on a condition -- marriage -- that the donee was unwilling to fulfill.  De Cicco, supra at 459.  In doing so, we stated succinctly:
"It is generally held that an engagement ring is in the nature of a pledge, given on the implied condition that the marriage shall take place.  If the contract to marry is terminated without fault on the part of the donor [he or she] may recover the ring" (emphasis added).
Id. at 458.
     Since then, we have not had occasion to consider the legal standard for assessing "fault" in this context.  But courts in our sister jurisdictions have identified several challenges of a fault-based approach to determining rights in engagement gifts following a failed amorous relationship.
     First, courts have identified the inherent difficulties in assigning responsibility for a prenuptial breakup.  See Heiman v. Parrish, 262 Kan. 926, 935 (1997) (describing "endless" scenarios that make ascribing fault fruitless, such as when parties discover they have nothing in common, difficulties with in-laws, hostility of one party's minor child, pets that cannot get along, untidy habits, or religious differences); Aronow v. Silver, 223 N.J. Super. 344, 349 (Ch. Div. 1987) ("What fact justifies the breaking of an engagement?  The absence of a sense of humor?  Differing musical tastes?  Differing political views?"); Campbell v. Robinson, 398 S.C. 12, 21 (Ct. App. 2012), citing Heiman, supra (observing that culpability of conduct in other contexts is determined by reasonable person standards but that, in context of prenuptial breakup, there is no legal standard to adjudge fault).  See also Meyer v. Mitnick, 244 Mich. App. 697, 703 (2001), citing Aronow, supra.  One court noted that, in the circumstances of a romantic relationship, "it is unlikely that trial courts would be presented with situations where fault was clear and easily ascertained."  Lindh v. Surman, 560 Pa. 1, 7 (1999).  See Vigil v. Haber, 119 N.M. 9, 11 (1994) (noting that trial court refused to determine which party was lying after parties introduced testimony containing accusations and counteraccusations regarding domestic conflict).  See also Brown v. Thomas, 127 Wis. 2d 318, 328 (Ct. App. 1985) (cautioning that fault "is often lost in the murky depths of contradictory, acrimonious, and largely irrelevant testimony by disappointed couples, their relatives and friends").  Another court wisely observed:  "In truth, in most broken engagements there is no real fault as such -- one or both of the parties merely changes his mind about the desirability of the other as a marriage partner."  Gaden v. Gaden, 29 N.Y.2d 80, 88 (1971).
     Second, courts have remarked that assigning blame to one who breaks an engagement is at odds with a principal purpose of the engagement period to allow a couple time to test the permanency of their wish to marry. 
"[I]t would seem highly ironic to penalize the donor for taking steps to prevent a possibly unhappy marriage.  Indeed, in one sense the engagement period has been successful if the engagement is broken since one of the parties has wisely utilized this time so as to avoid a marriage that in all probability would fail."  
Gaden, 29 N.Y.2d at 88.  See Fierro v. Hoel, 465 N.W.2d 669, 672 (Iowa Ct. App. 1990); Campbell, 398 S.C. at 22; Brown, 127 Wis. 2d at 329.  During the engagement period, parties "should be free to reexamine [their] commitment," and one court suggested that "public policy would be better served" if a party breaks an engagement promise rather than the marriage vows.  Heiman, 262 Kan. at 936.  Another court stated:  marriages "must be approached with intelligent care and should not happen without a decent assurance of success.  When either party lacks that assurance, for whatever reason, the engagement should be broken.  No justification is needed. . . .  Fault, impossible to fix, does not count."  Aronow, 223 N.J. Super. at 349.
     Third, courts have commented that the continued use of "fault" to determine interest in the engagement ring runs counter to the public policy embodied in statutes, such as our own heart balm act, which sought to rid the courts of actions where one jilted lover "appear[ed] in court to unfold his or her sorrows before a sympathetic jury."  Gaden, 29 N.Y.2d at 88.  While these courts have agreed with our assessment in De Cicco that statutes such as the heart balm act did not abolish actions founded on principles of unjust enrichment for the return of engagement gifts, they have pointed out that adding a required determination of fault to such actions simply involves the courts in the same type of acrimonious displays the heart balm act was designed to eliminate.[6]  See Gaden, supra.  See also Benassi v. Back & Neck Pain Clinic, Inc., 629 N.W.2d 475, 486 (Minn. Ct. App. 2001); Campbell, 398 S.C. at 23; Brown, 127 Wis. 2d at 328-329.
Fourth, courts have determined that, where the question of fault has become largely irrelevant to modern divorce proceedings, it also should be deemed irrelevant to the breaking of the engagement.  See Gaden, 29 N.Y.2d at 88.  See also Brown, 127 Wis. 2d at 329.  More than a decade after our decision in De Cicco, the Legislature adopted the no-fault approach to divorce proceedings by adding "irretrievable breakdown of the marriage" as a ground for divorce.  G. L. c. 208, § 1A.  Implicit in its adoption of the no-fault basis for divorce was the Legislature's recognition that married parties should have the freedom to "make personal and unavoidably subjective decisions" about their marriages without "unnecessary distress and embarrassing public disclosures" (quotation and citation omitted).  Caffyn v. Caffyn, 441 Mass. 487, 495 & n.18 (2004), quoting Wardle, No-Fault Divorce and the Divorce Conundrum, 1991 BYU L. Rev. 79, 96 (1991).  Other jurisdictions with no-fault divorce have determined that the underlying principles apply equally to the broken engagement context.  See Heiman, 262 Kan. at 936; Vigil, 119 N.M. at 11; Lindh, 560 Pa. at 7-8.  See also Fowler v. Perry, 830 N.E.2d 97, 106 (Ind. Ct. App. 2005); Meyer, 244 Mich. App. at 703 n.4; Benassi, 629 N.W.2d at 485; Aronow, 223 N.J. Super. at 349.
As a result of these considerations, the modern trend, and now majority view among courts that have considered this issue, is that the only relevant inquiry in conditional engagement gift cases is whether the condition under which the gift was made -- that is, the marriage ceremony -- has failed to occur.  Where the planned nuptial does not come to pass, the engagement gift must be returned to the donor.  See Heiman, 262 Kan. at 936-937 (engagement ring should be returned to donor without determination of fault except in "extremely gross and rare situations"); Vigil, 119 N.M. at 11 (following lead of "Iowa, New Jersey, New York, and Wisconsin in holding that when the condition precedent of marriage fails, an engagement gift must be returned"); Gaden, 29 N.Y.2d at 88 ("The crucial fact is that the engagement is dead," and gifts in contemplation of marriage must be returned); Lindh, 560 Pa. at 6 (no-fault approach involves "no investigation into the motives or reasons for the cessation of the engagement and requires the return of the engagement ring simply upon the nonoccurrence of the marriage").[7]
c.  Stare decisis.  We recognize that for more than half a century the fault-based rule of De Cicco has governed engagement gifts.  Thus, while the reasoning of our sister courts is persuasive, we must examine whether principles of stare decisis -- the idea that today's court should stand by yesterday's decisions and a foundational stone of the rule of law -- counsel that De Cicco's fault-based approach to engagement gifts should continue to govern.  See Kimble v. Marvel Entertainment, LLC, 576 U.S. 446, 455 (2015); Shiel v. Rowell, 480 Mass. 106, 108-109 (2018).  Stare decisis "promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process."  Shiel, supra at 108, quoting Payne v. Tennessee, 501 U.S. 808, 827 (1991).  For these reasons, "adhering to precedent is our 'preferred course'" (citation omitted).  Shiel, supra.
To respect stare decisis means "sticking to some wrong decisions," on the justification that "it is usually more important that the applicable rule of law be settled than that it be settled right" (quotation and citation omitted).  Kimble, 576 U.S. at 455.  "Parties should not be encouraged to seek reexamination of determined principles and speculate on a fluctuation of the law with every change in the expounders of it."  Mabardy v. McHugh, 202 Mass. 148, 152 (1909).  But "[n]o court is infallible," and the principle of stare decisis "is not absolute."  Stonehill College v. Massachusetts Comm'n Against Discrimination, 441 Mass. 549, 562, cert. denied sub nom. Wilfert Bros. Realty Co. v. Massachusetts Comm'n Against Discrimination, 543 U.S. 979 (2004).  Indeed, even where a decision is proper when issued, "[w]e invite challenges to antiquated laws" that conflict with modern societal norms.  See Shiel, 480 Mass. at 109.  We depart from precedent where "the values in so doing outweigh the values underlying stare decisis."  Franklin v. Albert, 381 Mass. 611, 617 (1980).  
Thus, overturning a prior decision must be undertaken with great care, requiring us to consider "the quality of [its] reasoning, [and] the workability of the rule it established" (citation omitted).  Knick v. Scott, 588 U.S. 180, 203 (2019).  We have cautioned that "[o]verruling precedent requires something above and beyond mere disagreement with its analysis."  Shiel, 480 Mass. at 109, citing Stonehill College, 441 Mass. at 588 (Sosman, J., concurring).  Where precedent has not caused "unforeseen problems," we adhere to our decision "unless there are developments that justify revisiting the law."  Shiel, supra.  And where, as here, the rule does not involve an interpretation of a statute and instead was of our own making, we have considered whether the prior court's rationale continues to be "consonant with the needs of contemporary society."  Lewis v. Lewis, 370 Mass. 619, 628 (1976).  We are amenable to changing an "outdated" or unworkable rule; "[o]ne of the great virtues of the common law is its dynamic nature that makes it adaptable to the requirements of society at the time of its application in court."  Shiel, supra, quoting Lewis, supra.  Applying these considerations to the fault analysis adopted in De Cicco, we conclude it is time to let it go.  
To begin, De Cicco addressed the question whether the heart balm act abrogated an action for unjust enrichment.  In doing so, we announced the fault-based rule without further analysis or guidance as to how "fault" is to be determined.  See De Cicco, 339 Mass. at 458.  Yet, as our sister jurisdictions have encountered, such an analysis is not workable when applied to amorous relationships.  Indeed, assessing blame when one party concludes that a proposed marriage would fail is at odds with a principal purpose of an engagement period to test the permanency of the couple's wish to marry.  Moreover, a fault-based analysis embroils the courts in precisely the type of actions the heart balm act was designed to eliminate.  Additionally, as is evident from the Legislature's adoption of no-fault divorce, adhering to the rule is out of step with modern relationships.  See Lindh, 560 Pa. at 6-8 (relying on development of no-fault divorce law to support adoption of no-fault approach to engagement ring disputes).  See also Thorndike vs. Demirs, Conn. Super. Ct., No. CV055000243S (July 26, 2007) (finding that "the modern no-fault rule is clearly the better rule and comports with the modern trends on handling family matters on a no fault basis").  Accordingly, we adopt the no-fault approach to determining ownership of an engagement ring after the engagement is terminated.  See Lewis, 370 Mass. at 628.
d.  Conditional gift.  Settino invites us also to jettison the conclusion in De Cicco that an engagement gift is a conditional gift given on the implied condition that the marriage shall take place.  De Cicco, 339 Mass. at 458.  But unlike the persuasive analysis from our sister courts regarding the unworkability of a fault-based approach to engagement gifts, on the record before us, the case for reconsidering the conditional gift aspect of our decision in De Cicco falls flat.  
All but one of the jurisdictions to consider the issue[8] continue to view engagement rings as gifts conditioned on the occurrence of marriage.  See Annot., Rights in Respect of Engagement and Courtship Presents When Marriage Does Not Ensue, 44 A.L.R.5th 1 § 2[a] (1996 & Supp. 2024) (noting that many courts consider engagement gifts to be conditioned upon subsequent marriage, particularly when dealing with "unique gifts such as engagement rings"); 38 Am. Jur. 2d Gifts § 71 (2024) ("courts generally regard a gift of an engagement ring as a gift conditioned on the subsequent marriage of the parties"); 38A C.J.S. Gifts § 68 (2024) ("An engagement ring by its very nature is a symbol of the donor's continuing devotion to the donee; once an engagement is cancelled, the ring no longer holds that significance").  See also Fowler, 830 N.E.2d at 104, quoting Webster's Third New International Dictionary 209, 751 (2002) (noting that engagement ring, different from any other ring, is by definition "given in token of betrothal," and "betrothal" is "a mutual promise or contract for a future marriage").[9]  This near universal understanding of engagement rings as gifts inherently conditioned on a subsequent marriage leads us to conclude that we must stand by our conclusion in De Cicco that an engagement gift is a conditional gift.[10]
e.  Retroactivity.  Decisional law generally applies retroactively in civil cases absent exceptional circumstances where retroactive application "would fail to protect the reasonable expectations of parties."  Shapiro v. Worcester, 464 Mass. 261, 268 (2013).  Retroactive application can be avoided where a party shows that (1) the decision creates a "novel and unforeshadowed rule"; (2) the purposes of the new rule are not furthered by retroactive application; and (3) retroactive application is likely to result in "hardship or inequity."  See Schrottman v. Barnicle, 386 Mass. 627, 631-32 (1982), citing McIntyre v. Associates Fin. Servs. Co. of Mass., 367 Mass. 708, 712 (1975).  Far from showing that retroactive application of the no-fault rule announced today would be inequitable, Johnson and Settino both argue that the fault-based rule announced in De Cicco should be retired.  Accordingly, Settino must return to Johnson the engagement ring and wedding band, each of which was given by Johnson to Settino in contemplation of marriage.
f.  Prejudgment interest.  Johnson argues that the trial judge erred in awarding prejudgment interest on the damages for Settino's counterclaim regarding Johnson's promise to pay for Settino's dental procedure.  The trial judge ordered prejudgment interest under G. L. c. 231, § 6C.  See Sterilite Corp. v. Continental Cas. Co., 397 Mass. 837, 841-842 (1986).  "An award of interest is made 'so that a person wrongfully deprived of the use of money should be made whole for [her] loss'" (citation omitted).  Id. at 841.
Relying on Sterilite, Johnson contends that awarding prejudgment interest to Settino results in a windfall because she had not completed the dental procedure prior to trial and "she was therefore not out of pocket any monies."  As the Appeals Court explained, our decision in Sterilite turned on when the insurer's duty to pay arose, not whether the insured was "out of pocket."  Johnson, 103 Mass. App. Ct. at 302.  See Sterilite, 397 Mass. at 841-842 (insurer's duty to pay arose on each date that insured had to pay its own legal fees despite insurer's obligation to defend, and prejudgment interest should have been calculated from each such separate date).
Here, the judge found that Settino relied to her detriment on Johnson's promise to pay for the dental procedure when she underwent the initial teeth extractions.  Thereafter, Johnson had a duty to pay for the second procedure for dental implants.  By withholding the promised funds, Johnson unlawfully detained money that rightfully belonged to Settino.  In these circumstances, prejudgment interest makes Settino whole in view of the delay in payment.  See Sterilite, 397 Mass. at 841-842.  
We also agree with the Appeals Court that calculating prejudgment interest from the date of Johnson's complaint was error.  Johnson, 103 Mass. App. Ct. at 303, citing Deerskin Trading Post, Inc. v. Spencer Press, Inc., 398 Mass. 118, 125-126 (1986).  Thus, the matter is remanded to calculate prejudgment interest from the date Settino filed her counterclaim.
3.  Conclusion.  We reverse so much of the judgment as awarded the engagement ring and wedding band to Settino, and judgment shall enter for Johnson on that count.  We vacate so much of the judgment as awarded prejudgment interest.  The matter is remanded for recalculation of prejudgment interest and entry of an amended judgment consistent with this opinion.
So ordered.
footnotes

[1] Johnson challenges the award of one of the bands to Settino.  In her cross appeal, Settino does not challenge the award of the other band to Johnson.
[2] Settino, a pro se litigant, originally counterclaimed for breach of contract.  The judge construed Settino's counterclaim as one of promissory estoppel.
[3] On appeal, Johnson does not contest the judge's finding that Johnson promised to pay for Settino's dental implant surgery and that Johnson must bear the reasonable cost to complete Settino's dental procedure.  He only challenges the award of prejudgment interest. 
[4] See Campbell v. Robinson, 398 S.C. 12, 21 (Ct. App. 2012) ("no legal standard exists by which a fact finder can adjudge culpability or fault in a prenuptial breakup").
[5] The heart balm act provides:  "Breach of contract to marry shall not constitute an injury or wrong recognized by law, and no action, suit or proceeding shall be maintained therefor."  G. L. c. 207, § 47A.
[6] Avoiding public court room disclosures is at the root of the Commonwealth's heart balm act, which the Legislature enacted in 1938.  See G. L. c. 207, § 47A.  Similar statutes across the country abolished actions for breach of promise to marry -- among other actions related to romantic relationships -- owing to the perceived propensity for abuse of the judicial system.  See Feinsinger, Legislative Attack on "Heart Balm," 33 Mich. L. Rev. 979 (1935).  See also Tushnet, Rules of Engagement, 107 Yale L.J. 2583, 2586-2588 (1998).
[7] See also In re Stoltz, 283 B.R. 842, 846 (Bankr. D. Md. 2002) (engagement ring was conditional gift that donee "was obligated to return upon the dissolution of the relationship"); Hattaway v. Coulter, 360 So. 3d 1047, 1055 (Ala. Civ. App. 2021) (holding that engagement ring was conditioned on fulfillment of marriage and donor was "entitled" to engagement ring when marriage did not occur); Thorndike vs. Demirs, Conn. Super. Ct., No. CV055000243S (July 26, 2007) (adopting modern view that fault should not determine who keeps engagement ring because "[i]f the marriage does not take place, the condition has not been met and the ring should be returned to the donor"); Carroll v. Curry, 392 Ill. App. 3d 511, 517-520 (2009) (holding that fault for termination of engagement contradicted plain language of replevin statute, which was basis for donor's action to reclaim engagement ring); Fowler, 830 N.E.2d at 106 ("fault is irrelevant, if ascertainable at all, because ownership of the engagement ring was conditional and the condition of marriage was never fulfilled"); Fierro, 465 N.W.2d at 672 ("If the wedding is called off, for whatever reason, the [engagement] gift is not capable of becoming a completed gift and must be returned to the donor"); Busse v. Lambert, 773 So. 2d 182, 183-184 (La. Ct. App. 2000); Meyer, 244 Mich. App. at 703-704 ("If the engagement is called off, for whatever reason, the [engagement] gift is not capable of becoming a completed gift and must be returned to the donor"); Benassi, 629 N.W.2d at 486 (fault "should not be given legal significance" in suits regarding return of engagement ring); Cooley v. Tucker, 200 So. 3d 474, 476 (Miss. Ct. App. 2016) (affirming trial court's finding that engagement ring was conditional gift and judgment therefore awarding ring, based on existing gift law, to donor when condition of marriage did not occur); Aronow, 223 N.J. Super. at 349 ("A person may have the best reasons in the world for [breaking an engagement].  The important thing is that the [engagement] gift was conditional and the condition was not fulfilled" [citation omitted]); Cooper v. Smith, 2003-Ohio-6083, ¶ 24 (Ct. App.) ("Unless the parties have agreed otherwise, the donor is entitled to recover the engagement ring [or its value] if the marriage does not occur, regardless of who ended the engagement"); Campbell, 398 S.C. at 21 ("We hold that the consideration of fault has no place in determining ownership of an engagement ring.  Generally, gift law will dictate who has the legal right to the ring"); Crippen vs. Campbell, Tenn. Ct. App., No. E2007-00309-COA-R3-CV (Sept. 24, 2007) ("If marriage, for whatever reason, does not ensue, ownership of the ring never vests in the donee and the donor is entitled to the return of the ring"); Brown, 127 Wis. 2d at 329 ("We therefore hold that the only relevant inquiry in conditional engagement gift cases is whether the condition under which the gift was made, i.e. 'in contemplation of marriage,' has failed").
[8] Only Montana views an engagement ring as an unconditional gift completed upon acceptance.  Albinger v. Harris, 2002 MT 118, ¶ 38.
[9] Contrary to Settino's argument, the treatment of engagement rings as conditional gifts is not an aberration.  See, e.g., Maffei v. Roman Catholic Archbishop of Boston, 449 Mass. 235, 253 (2007), cert. denied, 552 U.S. 1099 (2008) ("A resulting trust may be imposed to enforce a conditional gift"); Van Riper v. Van Riper, 445 Mass. 1007, 1007 (2005) ("The settlor correctly asserts that [conditioning a gift] will have the effect of minimizing her gift tax on the property by creating a reversionary interest in the property, thus reducing the value of the gift"); Fuss v. Fuss, 373 Mass. 445, 450 (1977) (discussing gift of real property "subject to a condition"); Bone v. Holmes, 195 Mass. 495, 505 (1907) (gift of bond was "subject to a qualified reservation of the interest" in donor); Barry v. Barry, 2 Mass. App. Ct. 809, 810 (1974) (sufficient evidence to support allegations that loan was "a conditional gift from the plaintiff to the defendant and that the defendant did not meet that condition").  See also Restatement (Second) of Property:  Donative Transfers § 31.2 (1992) (discussing conditional gifts).  
[10] Settino also contends that, on the record here, the rings were unconditional gifts because they were accompanied by receipts.  The judge disagreed.  Absent clear error, which Settino has not shown, we must accept the judge's finding that the rings were given and accepted "in anticipation of marriage" and therefore the gifts were conditioned on the marriage occurring.